**FRIENDS OF THE EARTH et al. Plaintiffs,**

v.

**POTOMAC ELECTRIC POWER COMPANY, Defendant.**

Civ. A. No. 75–747.

United States District Court, District of Columbia.

Aug. 16, 1976.

Neil J. Cohen, Frederic R. Kellogg, Clifton E. Curtis, Washington, D. C., for plaintiffs.

Richard G. Wise, Asst. Corp. Counsel, Washington, D. C., for District of Columbia.

George V. Allen, Jr., Washington, D. C., for Potomac Elec. Power Co.

## OPINION AND ORDER

BRYANT, District Judge.

### I. BACKGROUND

This matter is now before the Court on plaintiffs' Motion For Partial Summary

Judgment with respect to the issue of defendant's liability for violations of the District of Columbia's visible emissions limitations. This is a "citizen suit" under § 304 of the Clean Air Act, 42 U.S.C. § 1857h–2, as amended in 1970, requesting the Court to declare the defendant in violation of regulations establishing emission standards and limitations promulgated in the District of Columbia under the Act and of an abatement order issued by the District of Columbia pursuant to the Act, and to enjoin PEPCO to comply with the said order and all regulations promulgated under the Act. Jurisdiction of the Court is based on § 304(a) of the Act, and venue is proper under 42 U.S.C. § 1857h–2(c)(1).

Citizen suits under the Clean Air Act may be initiated only after sixty day notice describing the alleged violations is delivered to the defendant, the Environmental Protection Agency, and in this case the District of Columbia. Such notice has been timely given, and no suit for enforcement has been filed by the District of Columbia or the Environmental Protection Agency.

■ Plaintiff Friends of the Earth is a non-profit membership corporation organized pursuant to the laws of the State of New York, with a home office in San Francisco. It has a national membership of 28,-000, over 430 of whom reside and work in the District of Columbia, and is devoted to the preservation and enhancement of environmental values in the District of Columbia and throughout the United States, as well as enforcement of laws relating to environmental protection. It asserts in this action its organizational interest and the interest of its members in the preservation and enhancement of environmental values and protection of the public health and welfare in the District of Columbia. Members, contributors and supporters of FOE breathe air in the District of Columbia, and the quality of this air directly affects their health and welfare. Such persons are among the class of persons whom the Act was intended to protect.

Plaintiffs True and Meader are citizens who are concerned with remedying violations of the Act. Mr. True works in the District of Columbia and Mr. Meader resides and works in the District of Columbia. Both are members of FOE.

Defendant PEPCO is a corporate utility producing and generating electric power for distribution throughout the District of Columbia metropolitan area, including parts of the states of Virginia and Maryland. PEPCO has offices in the District of Columbia and owns, operates and maintains in said District facilities for the generation of electric power, by and involving the burning of fossil fuels, at 3400 Benning Road, N.E., and at Buzzard Point, S.W. Plaintiffs allege that these facilities continuously emit through various stacks air pollutants into the atmosphere.

The District of Columbia, originally named as a defendant in this action, has at its request been realigned as a plaintiff and concurs in the arguments advanced by the original plaintiffs.

As required by the Clean Air Act and regulations promulgated thereunder, the Government of the District of Columbia, a "state" for purposes of the Act, promulgated in January 1972 and revised and updated in April 1973 an Implementation Plan, which was in each case submitted to the Administrator of EPA. On June 22, 1973, the Administrator approved the "Implementation Plan April 1973" for the District of Columbia, with changes not material to this case. Appendix A of the Plan contains Title 8—Health Regulations of the District of Columbia, sections 8–2:701 through 8–2:731 inclusive. Those regulations are part of the EPA-approved state implementation plan (SIP). The purpose of the regulations is set out in section 8–701(a):

(a) *Purpose.* The purpose of this regulation is to prevent or minimize emissions as defined herein into the atmosphere and thereby protect and enhance the quality of the District's air resources so as to promote the public health and welfare of the people of the District of Columbia, and to enhance and improve the environment.

The scope of the regulations is set out in section 8–2:701(b):

> (b) *Scope.* This regulation shall apply to all operations in the District, including Federal operations, where consistent with the terms of the Clean Air Act (42 U.S.C. § 1857*l*), as amended, and regulations promulgated thereunder, the District of Columbia Air Pollution Control Act (D.C. Code, §§ 6–811 to 6–813), and Executive Order No. 11507, February 4, 1970 (35 F.R. 2573) entitled, 'Prevention, Control, and Abatement of Air and Water Pollution at Federal Facilities.'

Sections 8–2:708, Fuel-Burning Particulate Emissions, 8–2:713, Visible Emissions and 8–2:717, Records, Reports and Monitoring Devices, were enacted as part of Regulation No. 72–12, July 7, 1972. These regulations require immediate compliance by existing sources unless a written plan for delayed compliance is filed and approved by the District of Columbia. The deadline for compliance with all regulations is May 31, 1975. Section 8–2:720(b).

At issue in the current motion are the District's visible emissions regulations, contained in section 8–2:713 of the Regulations, which provides as follows:

> *Section 8–2:713.* VISIBLE EMISSIONS.
>
> Except as otherwise provided in this regulation, no person shall cause, suffer, or allow to be emitted into the outdoor atmosphere, visible emissions from stationary sources: *Provided,* That discharges not exceeding 40 percent opacity shall be permitted for 4 minutes in any 60 minute period and for an aggregate of 24 minutes in any 24 hour period until August 31, 1973. These discharges shall be allowed only for 'start-up', cleaning, soot blowing, and/or adjusting combustion controls of boilers. Where the presence of uncombined water is the only reason for failure of an emission to meet the requirements of this section, this section shall not be applicable. The provisions of this section shall not apply to visible emissions from interior fireplaces, or from sources set forth in Section 8–2:711(b).

Plaintiffs allege a whole series of violations by defendant PEPCO's Benning Road facility of this regulation, and ask in this motion that the Court enter declaratory judgment as to PEPCO's consequent liability.

## II. PRELIMINARY QUESTIONS

PEPCO contends that declaratory judgment is not appropriate here, arguing that the violations alleged by plaintiffs came from coal-fired boilers no longer in use, and that these past emissions are irrelevant to the possibility of future violations. PEPCO argues further that for partial declaratory summary judgment to be permissible here, plaintiffs must demonstrate a right to injunctive relief, and that this has not been done because the possibility of future injury is "remote and uncertain". Therefore, PEPCO concludes, declaratory relief is premature and would result in a piecemeal resolution of the case.

PEPCO's contention that plaintiffs must show "a right to equitable relief by injunction" before a declaratory judgment is permissible is without merit. The Supreme Court has held explicitly that "a request for declaratory relief may be considered independently of whether other forms of relief are available," stating that the availability of declaratory relief depends not on the appropriateness of coercive relief but on whether there is a live case or controversy. *Powell v. McCormack,* 395 U.S. 486, 517–518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). PEPCO contends that no such controversy exists, since the complaint is based on past violations from coal-fired boilers which have been removed or converted to oil and which, therefore, are not indicative of the probability of future injury. However, as discussed below, PEPCO's own reports show that emissions were observed after August 21, 1975, when boilers 25 and 26 were converted to oil. Since these boilers continue to burn the same type of oil, such observations reflect the current state of PEPCO's operations and demonstrate the existence of a live controversy between the parties.

PEPCO also argues that declaratory relief would lead to a piecemeal resolution of this dispute. While a declaratory judgment must be conclusive and must settle the controversy, *Panama Processes, SA v. Cities Service Co.*, 362 F.Supp. 735, 738 (S.D.N.Y., 1973), *aff'd.*, 496 F.2d 533 (2 Cir., 1974), this does not mean that every aspect of the suit must be resolved by the declaratory judgment. See, e. g., 6A *Moore's Federal Practice* § 57.08[4]. The question at issue in this motion for partial summary judgment is completely self-contained and wholly segregable from the other issues in the case. This cause of action deals only with the visible emissions limitations of § 8–2:713, and is particularly suited for resolution in this fashion. Violations of the visible emissions limitation can be established by visual observation, and PEPCO's own records establish such violations. The other cause of action, dealing with violation of the particulate emissions regulation, will likely have controverted facts, with violations to be established on the basis of stack tests of disputed accuracy. Moreover, significant additional discovery will be necessary both with respect to the particulate emissions issues and for plaintiffs to propose relief with respect to the visible emissions violations. Judicial economy and the public interest are best served in this instance by assuring that this discovery is not undertaken needlessly, which means that the common legal issues should be resolved at the present stage and that the Court should determine the visible emissions issue before the case proceeds further. The Court believes that this will "probably result in a just and more expeditious determination of the entire controversy." *Aetna Insurance Co. v. Transamerica Insurance Co.*, 262 F.Supp. 731, 732 (E.D.Tenn., 1967).

One further observation relating to relief is warranted. PEPCO contends that even if the Court declares it in violation, no meaningful relief can be ordered before it is determined what relief may be necessary to cure the alleged particulate emissions violations. Plaintiffs argue that they should be allowed to propose relief at the present stage. The Court agrees that once visible emissions violations are found, as here, plaintiffs are entitled to proceed towards the formulation of appropriate relief proposals. Plaintiffs should recognize however that the considerations articulated by PEPCO (such as compatibility of relief) are relevant to the propriety of any particular form of relief, as is the possibility that a relaxation of § 8–2:713 may shortly be approved by EPA as a revision of the District of Columbia State Implementation Plan. These are matters to be considered on their merits as various proposals for relief are advanced and considered by the parties and the Court.

## III. THE MERITS

This motion involves visible emissions from coal-fired stoker boilers at the Benning Road facility (boilers 3, 9, 11, 12, 14, and 15) which emit smoke through stacks 2 and 3, and two boilers at the Benning Road plant (nos. 25 and 26) which are capable of burning coal or oil and which emit smoke through stacks 4 and 5. The coal-fired stoker boilers have now been replaced by two new oil-fired boilers, which do not yet have permits for regular operation and are consequently not now at issue. Plaintiffs urge that despite the replacement of the coal-fired boilers declaratory and injunctive relief is appropriate as to those boilers, arguing that they could be reactivated at some time in the future. PEPCO maintains that these coal-fired boilers have been totally dismantled, allowed to deteriorate physically beyond safe repair, have been retired from its regulatory rate base, and will never be used again. The Court accepts PEPCO's sworn statements that this equipment has been permanently dismantled, and accordingly believes that emissions from those boilers are no longer relevant to this motion. Boilers 25 and 26 were converted within the last year from coal to oil pursuant to a one-year exemption granted by the Federal Energy Administration. On April 1, 1976 FEA revised its regulations to eliminate permanently the requirement that these units burn coal, 41 *Federal Register* 13896. PEPCO asserts that it has no plans

to reconvert these units to coal at any time, and that the plant will at any rate be physically unable to store coal for approximately two years. It also explicitly concedes that boilers 25 and 26 cannot lawfully be reconverted to coal without additional emission control measures. The Court therefore also regards the violations by these boilers during the time when they were fueled by coal as irrelevant to the instant motion. Since the conversion of boilers 25 and 26 to oil, however, visible emissions have continued. There is no issue of fact as to the existence of these visible emissions: PEPCO's own records show at least twenty-four such incidents between the time of the conversion (around August 21, 1975) and December 23, 1975. In addition, PEPCO admits the existence of occasional visible emissions, stating in fact that such emissions are unavoidable during abnormal operating conditions (cold boiler start-up, boiler shutdown, adjustment of boiler controls during major shifts in generator load, and malfunction of equipment), except by plant shutdown. For the foregoing reasons, the balance of the Court's discussion of the merits of plaintiffs' motion will proceed on the premise and be addressed to the significance of continuing visible emissions from boilers 25 and 26 at the Benning Road facility, operating in an oil-fired mode.

 Although it might appear that since the existence of visible emissions in the face of a regulation which prohibits any visible emissions has been established, the discussion would be at an end, PEPCO advances a series of legal arguments by which it hopes to avoid the impact of the regulation. Certain of these arguments are not frivolous and merit discussion. PEPCO first points out that on April 26, 1974 the D.C. City Council amended the provisions of § 8–2:713 to permit visible emissions not exceeding 20% opacity for 2 minutes in any 60 minute period and for an aggregate of 12 minutes in any 24 hour period, if such emissions result from start-up, cleaning, soot blowing, and/or adjusting combustion controls of boilers. This proposed revision of the D.C. State Implementation Plan was submitted to EPA for approval under § 110(a)(3) of the Clean Air Act. The Agency has not yet approved the revision, but verbal and written correspondence between EPA and D.C. officials indicates that as of mid-1976 the Agency had tentatively decided to disapprove the revision as too stringent and therefore impracticable. PEPCO argues that since the new regulation is less stringent than the old one, and since both the District and apparently EPA view the old one as too stringent, it would be absurd to interpret the law to require compliance with the old regulation. However attractive this argument might at first appear, the Court does not start with a clean slate in interpreting the law. It is now settled that a state implementation plan (SIP) may contain control strategies involving emission limitations more stringent than those necessary to meet the minimal requirements of the primary and secondary ambient air quality standards. *Union Electric Co. v. Environmental Protection Agency,* —— U.S. ——, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). Revisions in an SIP must be approved by EPA to become effective, see *Train v. N.R.D.C.,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), and before any such change is approved the effective, federally-enforceable requirement is the prior one, which has been approved by EPA. *Metropolitan Washington Coalition For Clean Air v. District of Columbia,* 167 U.S.App.D.C. 243, 511 F.2d 809 (1975). The current federally-enforceable requirement is therefore the original § 8–2:713, wholly prohibiting visible emissions.

 PEPCO also argues in this connection that the visible emission regulation is somehow not federally enforceable, claiming that it does not "implement an ambient air quality standard". This argument is without merit. Section 304(a)(1) provides that a citizen suit may be brought against any person "who is alleged to be in violation of (A) an emission standard or limitation under this Act . . .". Section 304(f) defines the phrase "emission standard or limitation under this Act" to include "a schedule or timetable of compli-

ance, emission limitation, standard of performance or emission standard . . . which is in effect . . . under an applicable implementation plan." Section 110(d) defines an "applicable implementation plan" as "the implementation plan, or most recent revision thereof, which has been approved under subsection (a) or promulgated under subsection (c) and which implements a national primary or secondary ambient air quality standard in a State." To be approved by EPA, the District of Columbia's implementation plan had to be "a plan implementing a national primary ambient air quality standard . . ." [§ 110(a)(2)(A)(i)]. Such a plan must include "emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary . . . standard . . . ." [§ 110(a)(2)(B)]. The District of Columbia's limitation on visible emissions is obviously an "emission limitation". PEPCO cites no authority to the contrary, and indeed it is well-settled that such visible emissions regulations are emission limitations for pollution control purposes in general and for the Clean Air Act in particular. See, e. g., *Portland Cement Association v. Train*, 168 U.S.App.D.C. 248, 513 F.2d 506, 508 (1975), *reh. den.*, June 19, 1975, *cert. den.*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975), *reh. den.*, 423 U.S. 1092, 96 S.Ct. 889, 47 L.Ed.2d 104 (1976). Furthermore, in order for visible emissions regulations not to be related in any way to the implementation of the ambient air quality standards, PEPCO must show that visible emissions are wholly unrelated to the emission of any pollutants for which there are ambient air quality standards. It seems obvious that, since PEPCO admits that visible emissions result from particulate emissions during abnormal operations, it can hardly contend that a visible emission regulation is wholly unrelated to achievement of ambient air quality standards. And while visible emissions limitations may be contained in a plan designed to achieve a greater degree of reduction of pollution than that required to meet the primary or secondary standards,

as long as the regulation is part of the approved plan implementing those standards it is federally enforceable by way of § 304 citizen suits. See, *Union Electric Co. v. EPA, supra.*

PEPCO further contends that the original, approved § 8–2:713 should not be construed to prohibit all visible emissions from stationary sources. PEPCO suggests that the EPA approval of the regulation should not be taken as an approval of the provision eliminating the abnormal operations exemption as of August 31, 1973, and analogizes the automatic elimination provision to a variance. PEPCO also argues that EPA has implicitly approved the repeal of the old regulation and has implicitly disapproved the continued operation of that regulation. The relation of these arguments to any reasonable interpretation of the Clean Air Act is at best tangential. EPA explicitly approved the old regulation in its entirety, and it is therefore effective in its entirety, including the elimination of the abnormal operations exemption. Moreover, the provision for the automatic elimination of the exemption on August 31, 1973 bears no relation whatever to a variance under an SIP. See, *Train v. N.R.D.C., supra.* All variances operate to relax requirements otherwise imposed under a plan; this provision is exactly the opposite, and EPA would have had no power to disapprove a provision increasing the stringency of the regulation. *Union Electric Co. v. EPA, supra.* Nor does the correspondence and discussion between EPA Region III officials and District of Columbia officials, in which EPA indicated a preliminary intention to disapprove the new regulation as impracticably stringent, amount to an implicit approval of the repeal of the more stringent old regulation. No such legal effect can be ascribed to these informal interchanges, and indeed after *Union Electric* it is highly doubtful that EPA will be able to disapprove the new regulation for excessive stringency. However until the Agency does approve the new regulation, the zero-visible-emission regulation is the law, enforceable by citizen suit. Of course in formulating relief, the

Court will naturally take into account the probability that approval of the new regulation is imminent, if indeed that appears to be the case.

Finally, PEPCO asserts that the alleged technological and economic infeasibility of the absolute prohibition on visible emissions constitutes a defense to a charge of violation of the regulation. PEPCO relies principally on *Buckeye Power, Inc. v. EPA*, 481 F.2d 162 (C.A. 6, 1973), to sustain this contention. The question of whether a violator may in certain circumstances raise a defense of economic or technological infeasibility was explicitly left open by the Supreme Court in *Union Electric, supra* at n. 18. The Court's reasoning and findings however totally undermine the rationale of the *Buckeye* court, leaving its holding without persuasive effect. The *Buckeye* court examined the legislative history of the 1970 Clean Air Act amendments and found that Congress did not intend plant shutdowns in the face of failure to meet the requirements of SIPs, 481 F.2d at 168. The Supreme Court, in contrast, found that the Act is meant to be "technology-forcing", and that public health had been given absolute priority over continued operations of noncomplying polluters. The *Buckeye* court further articulated the rationale underlying its holding as follows:

> Since we have determined that there could not have been an adequate hearing on individual claims such as those presented by the petitioners herein prior to approval of the state plans, the claims can be asserted as a defense in either federal or state enforcement proceedings.

481 F.2d at 173. The Supreme Court however held that such individual claims were wholly irrelevant to the Administrator's decision to approve or disapprove a state plan, and that such claims could rather be considered by the state in formulating the plan. Since the underlying premise of the *Buckeye* court has been found to be faulty, its holding cannot be given effect in the present case. And finally, despite the *Buckeye* court's reading of the legislative history of the 1970 amendments, that legislative history clearly contemplates that the Act's requirements be technology-forcing, and plainly reflects a congressional intent that claims of technological and economic infeasibility not constitute a defense to an adjudication of violation of applicable SIP requirements. See, *Union Electric, supra*; Bonine, "The Evolution of 'Technology-Forcing' In The Clean Air Act", 6 *Environmental Reporter*, Monograph No. 21 (July 25, 1975); Bleicher, "Economic And Technical Feasibility In Clean Air Act Enforcement Against Stationary Sources", 89 *Harv. L.Rev.* 316 (1975). This does not mean that each source that is genuinely unable to comply with every requirement of an SIP must inevitably be closed; in formulating equitable relief the Court must always exercise discretion and balanced judgment. While this judgment must give dominant weight to the public health interests protected by the Act, the Court might for example, upon a finding of prior good faith efforts at compliance by the source, place it on a tight compliance schedule with shutdown specifically ordered if compliance had not been effected by a date certain. Whether such an extension of the original SIP requirements may be permitted will depend on the circumstances of each case, again with the public health criteria of the Act as primary guidelines. It may also of course be relevant to consider what relief plaintiffs actually seek; in the present case, they seek not shut-down but the maximum compliance possible given the current state of pollution control technology.

Accordingly, it is by the Court this 16th day of August, 1976,

ORDERED, that plaintiffs' motion for partial summary judgment be, and hereby is, granted, and it is

ADJUDGED AND DECLARED, that defendant Potomac Electric Power Company, in the operation of boilers 25 and 26 at its Benning Road facility in the District of Columbia, is and has been in violation of § 8–2:713 of the Health Regulations of the District of Columbia, which section constitutes part of the approved State Implemen-

tation Plan for the District of Columbia pursuant to the Clean Air Act.