UNITED STATES of America, Plaintiff,

v.

**WHEELING–PITTSBURGH STEEL CORPORATION, Defendant.**

Civ. A. No. 79–1194.

United States District Court,
W.D. Pennsylvania.

June 2, 1986.

Craig McKay, Asst. U.S. Atty., Thomas Au, Dept. of Environmental Resources, Harrisburg, Pa., Larry Kopelman, Sp. Asst. Atty. Gen., W. Va., Air Pollution Control Com'n, Charleston, W. Va., E. Dennis Muchnicki, Asst. Atty. Gen., Ohio E.P.A., Columbus, Ohio, William D. Evans, Jr., Environmental Enforcement Section, U.S. Dept. of Justice, Richard E. Ostrov, Office of Legal &

Enforcement Counsel, U.S. E.P.A., Washington, D.C., Sheldon Novick, Regional Counsel, Region III, U.S. E.P.A., Philadelphia, Pa., Ann Swofford, Enforcement Div., U.S. E.P.A., Region V, Chicago, Ill., for U.S.

George Raynovich, Jr., Vice-President, Sec'y and Gen. Counsel, Wheeling-Pittsburgh Steel Corp., Pittsburgh, Pa., Joe Fleming, II, Washington, D.C., David Armstrong, Leonard Costa, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for Wheeling-Pittsburgh Steel.

## MEMORANDUM OPINION

TEITELBAUM, District Judge.

The Environmental Protection Agency (EPA) moves for civil contempt and to enforce judgment alleging violations of emission standards set forth in the second amendment to the consent decree by Wheeling-Pittsburgh Steel Corporation (Wheeling-Pitt) at its Follansbee, West Virginia coke plant.

To produce coke, coal is first deposited in coke ovens in a "charging" process using a "larry car." The coal is then heated in the ovens in a "coking" process. The coke is then "pushed" from the ovens into cars. Each of these steps produces visible emissions which are addressed in the second amendment.

### 1. Demonstration of compliance with door emission standard

The second amendment required a demonstration of compliance with the coke oven door emission standard. It required, in sum, a 30 day showing that no more than 10% of the doors were leaking. EPA rejected Wheeling-Pitt's purported demonstration of compliance because 1) the tests were conducted at a time when the coke ovens were operating at lower than normal production rates; 2) Wheeling-Pitt took the benefit of two doors representing the last oven charged, although only one door was observed; and 3) exceedences over 10% were rounded down to 10%.

### a. Production rates

EPA rejected Wheeling-Pitt's purported demonstration of compliance with the coke oven door emission standard, in part, be-cause the tests were conducted at a time when the coke ovens were operating at less than their normal maximum production rates. The normal maximum production rates for coke oven batteries 1, 2 and 3 are approximately 17–18 hours coking time; the normal maximum production rate for coke oven battery 8 is approximately 16–17 hours coking time. At the time the demonstrations of compliance were conducted batteries 1, 2 and 3 were operating at approximately 36–38 hours coking time and battery 8 was operating at approximately 22–32 hours coking time.

The second amendment does not expressly require that the coke oven door demonstration of compliance be conducted at any particular level of operation. It is EPA's position that the requirement that the coke oven door demonstration of compliance be conducted with the batteries operating at their normal maximum production rates is an implied term in the second amendment. EPA contends this requirement is an implied term in the second amendment based on the self-evident purpose of a demonstration of compliance and based on the provision of the second amendment relating to stack tests. The provision of the second amendment relating to stack tests required an evaluation of visible emissions and required that the facility be operated at the normal maximum production rate during a stack test.

A consent decree is to be construed for enforcement purposes basically as a contract. *U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). The second amendment cannot fairly be read to imply a particular level of operation for the coke oven door demonstration of compliance. The provision that the facility be operated at the normal maximum production rate during a stack test indicates nothing about the door emission demonstration of compliance. If any inference could be drawn from the express provision of a level of operation for the stack test, it would be that the silence of the second amendment as to a level of operation for the door emission demonstra-

tion of compliance meant that no particular level was required.

A decree must be construed as it is written. *Id.* at 236, 95 S.Ct. at 934. The parties to a decree generally have opposing purposes and the resultant decree embodies as much of those opposing purposes as the parties have the bargaining power and skill to achieve. *Id.* at 235–236, 95 S.Ct. at 933–934. It is undoubtedly true that the purpose of the coke oven door demonstration of compliance would have been better served if the test had been conducted with the batteries operating at their normal maximum production rates. But the decree is not so written.

■ Accordingly, the fact the tests were conducted at a time when the coke ovens were operating at less than their normal maximum production rates does not invalidate the coke oven door demonstration of compliance under the terms of the second amendment.

b. *Formula for calculating compliance*

EPA rejected Wheeling-Pitt's demonstration of compliance with the coke oven door emission standard, in part, because Wheeling-Pitt took the benefit of two doors representing the last oven charged, although only one door was observed.

Compliance with the coke oven door emission standard is measured by a formula which expresses, in a percentage, the number of doors observed leaking as compared to the number of doors actually observed.

The two doors on either side of the last oven charged are assumed to leak emissions. Therefore in making this calculation the two doors representing the last oven charged are subtracted from the number of doors observed leaking.

At most coke oven batteries, including battery 8 at Follansbee, door emission surveys involve observations of doors on both sides of the battery. However, batteries 1, 2 and 3 at Follansbee have a "shed" installed on one side of the battery, which permanently obstructs observation of those doors. Therefore in making this calculation the doors under the shed are not counted.

■ In its demonstration of compliance at battery 8, where the doors on both sides of the coke ovens were observed, Wheeling-Pitt correctly used the formula to subtract two doors from the doors observed leaking to represent the last oven charged. However, at batteries 1, 2 and 3, where doors on one side of the coke ovens were obstructed by the shed, Wheeling-Pitt continued to subtract two doors from the doors observed leaking to represent the last oven charged, in spite of the fact that only one door on the last oven charged was observed, the other door being obstructed by the shed.

Applying the formula set forth in the second amendment, four door emission surveys at battery 1 and two door emission surveys at battery 2 exceeded the emission standard.

c. *Rounding down*

Compliance with the coke oven door emission standard required that the percentage of doors leaking, as calculated in the manner discussed above, at part 1.b. did not exceed 10%. The second amendment did not authorize Wheeling-Pitt to "round down" small exceedences to 10%. Five door emission surveys at battery 8, four at battery 1 and two at battery 2 exceeded the 10% standard.

2. *Demonstration of compliance with charging emission standard*

The second amendment required a demonstration of compliance with the charging emission standard. It required, in sum, a showing of not more than 100 seconds of emissions on four successive charges. EPA rejected Wheeling-Pitt's purported demonstration of compliance because 1) the tests were conducted at a time when the coke ovens were operating at lower than normal production rates; and 2) Wheeling-Pitt did not submit a 30 day showing of compliance.

### a. Production rates

EPA rejected Wheeling-Pitt's purported demonstration of compliance with the charging emission standard at battery 1 because the tests were conducted at a time when the coke ovens were operating at less than their normal maximum production rates. EPA's position on this issue is the same as its position on the production rates for the coke oven door emission standard, stated above at part 1.a. For the same reasons, stated above at part 1.a., the Court concludes that the fact that tests were conducted at a time when the coke ovens were operating at less than their normal maximum production rates does not invalidate the battery 1 charging emission demonstration of compliance under the terms of the second amendment.

### b. Duration of demonstration

EPA rejected Wheeling-Pitt's purported demonstration of compliance with the charging emission standard at batteries 2 and 3 because Wheeling-Pitt submitted only a four day showing of compliance, and not a 30 consecutive day showing. EPA contends four days is an inadequate data base to demonstrate compliance.

The second amendment does not expressly specify any minimum period for the charging emission demonstration of compliance at batteries 2 and 3. It is EPA's position that the requirement that the demonstration of compliance with the charging emission standard at batteries 2 and 3 be based on a 30 consecutive day data base is an implied term in the second amendment. EPA contends this requirement is an implied term in the second amendment based on the self-evident purpose of a demonstration of compliance and based on the provision of the second amendment relating to battery 1. The provision of the second amendment relating to battery 1 required a 30 consecutive day demonstration of compliance with the charging emission standard.

■ EPA's position on this issue is substantially the same as its position on an implied production rate, stated above at part 1.a. Again, the Court makes the same

findings: it is undoubtedly true that a 30 consecutive day demonstration would better serve the purpose of the demonstration; however, within its four corners the second amendment cannot fairly be read to imply a duration requirement for the charging emission demonstration of compliance at batteries 2 and 3.

Accordingly, the fact that only four days of data were submitted does not invalidate the charging emission demonstration of compliance at batteries 2 and 3 under the terms of the second amendment.

### 3. Interim requirements—charging emission standard

During an interim period two larry cars charged coal on batteries 1, 2 and 3. One of these larry cars was capable of stage charging, which reduces emissions, and one was not. A second stage charging larry car was to replace the non-stage charging larry car by the end of the period. In the interim the stage charging larry car was to be used to charge coal at battery 1 and ovens 1–26 at battery 2; the non-stage charging larry car was to be used to charge coal at battery 3 and ovens 27–52 at battery 2 when the coking time was less than 25 hours.

When the stage charging larry car malfunctioned and was down for repairs, the non-stage charging larry car was used, in contravention of the second amendment. This occurred on 293 occasions which represents less than 3% of the charges made in this period.

Wheeling-Pitt submits its use of the non-stage charging larry car was the only practical course available because the only other option, suspending operations, would have caused permanent damage to the batteries. Wheeling-Pitt further submits its use of the non-stage charging larry car in these circumstances is in harmony with the spirit of the interim procedure which, by permitting use of a non-stage charging larry car until a second stage charging larry car was available, reflects a compromise between economic necessity and pollution control.

■ It is well-established that inability to comply with an order is a valid defense in a civil contempt action. *United States v. Rylander,* 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521, *reh. denied,* 462 U.S. 1112, 103 S.Ct. 2466, 77 L.Ed.2d 1342 (1983). There is also authority for the proposition that substantial compliance is a valid defense to a civil contempt action. *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union,* 531 F.2d 617, 621 (D.C.Cir.1976).

On the other hand, as discussed infra, at part 4., if the consent decree merely incorporates a requirement of a state implementation plan (SIP) so that a violation of the decree is also a violation of the SIP and the Clean Air Act, the question of available defenses must be governed by the Clean Air Act. Economic or technological infeasibility are not defenses to a Clean Air Act enforcement action.

■ The prohibition against the use of the non-stage charging larry car in the second amendment is not derived from the West Virginia SIP and the usual defense of substantial compliance is therefore not displaced.

Wheeling-Pitt complied with the second amendment's prohibition against the use of the non-stage charging larry car for 97% of the charges in the interim period. Its use of the non-stage charging larry car was reasonable under the circumstances.

Accordingly Wheeling-Pitt substantially complied with the prohibition against the use of the non-stage charging larry car. This is a valid defense to EPA's motion to hold Wheeling-Pitt in contempt for its use of the prohibited larry car.

4. *Maintain compliance with door emission standard*

The second amendment requires Wheeling-Pitt to maintain compliance with the door emission standard. Between August 30, 1983 and February 15, 1985 during 1,644 door surveys there were 764 violations of the door emission standard. That is, Wheeling-Pitt was in violation of the door emission standard 46% of the time.

Wheeling-Pitt contends it has substantially complied with the door emission standard. It describes the efforts it has made to deal with what it characterizes as the complex problem of door leaks during the coking process.

The door emission standard in the second amendment incorporates the standard from the West Virginia SIP. Thus, a violation of the second amendment is also a violation of the West Virginia SIP and the Clean Air Act.

As noted above, at part 3, substantial compliance is usually a defense to a civil contempt action.

■ Wheeling-Pitt's assertions of substantial compliance with the door emission standard are, in fact, no more than assertions that it is economically and technologically infeasible for them to comply with the standard. Whether assertions of economic or technological infeasibility constitute a defense to a Clean Air Act enforcement action has been expressly left unanswered by the Supreme Court. *Union Electric Co. v. EPA,* 427 U.S. 246, 268 n. 18, 96 S.Ct. 2518, 2530 n. 18, 49 L.Ed.2d 474, *reh. denied,* 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154 (1976). The only reported decision addressing the question since then, has held that economic or technological infeasibility is not a defense. *Friends of the Earth v. Potomac Electric Power Co.,* 419 F.Supp. 528, 535 (D.D.C.1976). Following *Friends of the Earth,* this Court likewise concludes economic or technological infeasibility is not a defense to a Clean Air Act enforcement action.

■ Believing Wheeling-Pitt violated the door emission standard, EPA had two options: it could have sought enforcement of the Clean Air Act, or it could have sought enforcement of the consent decree. Had EPA sought enforcement of the Clean Air Act, economic or technological infeasibility would not be a defense. Although EPA sought enforcement of the consent decree, the same result must follow. That is, the Clean Air Act's prohibition against the defenses of economic or technological infeasi-

bility displaces the usual contempt defense of substantial compliance. A contrary result would elevate the form of the proceedings over their substance.

Even if Wheeling-Pitt could assert substantial compliance as a defense to the violation of the West Virginia SIP incorporated in the second amendment, compliance only 54% of the time is not substantial enough compliance to constitute a complete defense.

Accordingly, Wheeling-Pitt has not maintained compliance with the door emission standard.

### 5. *Maintain compliance with charging emission standard*

The second amendment requires Wheeling-Pitt to maintain compliance with the charging emission standard. Between August 30, 1983 and February 15, 1985 during 896 observations there were 283 violations of the charging emission standard. That is, Wheeling-Pitt was in violation of charging emission standards 34% of the time.

Again, the position of Wheeling-Pitt on this issue is the same as on the issue of maintaining compliance with the door emission standard, set forth above at part 4. Wheeling-Pitt contends it has substantially complied.

■ Again, the Court concludes that because the charging emission standard in the second amendment incorporates the West Virginia SIP, substantial compliance cannot be a defense, and that even if it could be asserted as a defense, Wheeling-Pitt has not substantially complied with the charging emission standard.

Accordingly Wheeling-Pitt has not maintained compliance with the charging emission standard.

### 6. *Maintain compliance with pushing emission standard (baghouse fire)*

The second amendment requires Wheeling-Pitt to maintain compliance with the pushing emission standard. Pursuant to the consent decree Wheeling-Pitt had installed a shed to control pushing emissions. The shed captures pushing emissions, channels them into a duct system and then to a baghouse where the air is cleaned. On October 25, 1983 a fire occurred, causing damage to the bags. It is believed that the fire was caused by an accumulation of particulate matter in the ductwork which was ignited by the temperature of the exhaust gas passing through the ductwork. The system was out of operation until March 26, 1984 when it was returned to service.

EPA first contends Wheeling-Pitt is liable for violations of the pushing emission standard for the entire period the system was down—October 25, 1983 to March 26, 1984—because the fire was preventable. EPA points to several facts: hot spots in the ductwork had been observed before the fire; the ductwork was not regularly inspected or regularly cleaned; and the system did not have a temperature sensitive device to automatically shut off the exhaust gas in the event of excessive heat.

■ Understandably EPA's hindsight is more accurate than its foresight: the system as installed by Wheeling-Pitt had been approved by EPA without the inspections, cleaning and shut-off device EPA now endorses. Wheeling-Pitt's operation of the system as approved by EPA cannot now be the basis for imposition of sanctions.

EPA next contends Wheeling-Pitt is liable for violations of the pushing emission standard for most of the period the system was down because repairs could have been effected almost immediately. EPA contends repairs could have been made quickly if a full inventory of replacement bags had been kept on site and/or fluorescent tracer material to determine which bags need to be replaced had been kept on site.

Again, the system as approved by EPA had no such requirements.

Finally, EPA contends Wheeling-Pitt is liable for violations of the pushing emission standard for approximately a third of the time the system was down because, even without a full inventory of replacement bags and/or fluorescent tracer material, repairs were not expeditiously made.

Wheeling-Pitt explains there was delay in the receipt of bags because of supplier error and delay in the installation of bags because severe weather required diversion of available manpower to other operations considered more critical.

█ Wheeling-Pitt should not have been surprised by either the supplier errors or the cold winters. These are common occurrences dealt with on a regular basis. Repairs to the system were not made as expeditiously as possible.

Wheeling-Pitt is liable for violations of the pushing emission standard for 57 days.

7. *Civil penalty for prior violations*

The second amendment required Wheeling-Pitt to pay $10,000 for violations which occurred prior to the entry of the second amendment. Wheeling-Pitt has never paid this $10,000 civil penalty and has not contested its liability for this amount.

An appropriate order will issue.

### ORDER

AND NOW June 2, 1986 in accordance with the foregoing memorandum opinion, IT IS HEREBY ORDERED that the parties are directed to confer and submit, within thirty (30) days, a proposed judgment assessing stipulated penalties for the failure to demonstrate compliance with the door emission standard at batteries 1, 2 and 8;

IT IS FURTHER ORDERED that defendant employ an additional person to serve in a full-time capacity as a coke oven process environmental engineer/supervisor to develop a comprehensive and professional program for achieving and maintaining compliance with applicable coke oven emission standards at the Follansbee Plant. This full-time environmental engineer/supervisor shall determine the degree, sources and causes of excess emissions; research the available emission control equipment, practices and techniques within the industry; evaluate the feasibility, performance and cost of such emission control equipment, practices and techniques; and recommend the utilization of appropriate emission control equipment, practices or techniques to eliminate excess emissions. This full-time environmental engineer/supervisor shall consolidate and expand all existing records and data created and maintained by defendant's Environmental Control and Operating Departments and, with the establishment of appropriate lines of communication and authority, direct personnel and workers in or under those departments so as to maximize emission control at defendant's Follansbee Plant.

IT IS FURTHER ORDERED that judgment is entered for plaintiff and against defendant in the amount of $10,000.00.

No civil contempt penalties or Clean Air Act civil penalties are assessed.