**UNITED STATES of America, Plaintiff,**

and

**Maryland Waste Coalition,
Intervening Plaintiff,**

v.

**SCM CORPORATION, Defendant.**

**Civ. A. R–85–9.**

United States District Court,
D. Maryland.

Sept. 1, 1987.

Fred R. Disheroon, Special Litigation Unit and David I.S. Thomson, Environmental Enforcement Sec. Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

G. Macy Nelson, Baltimore, Md., for Maryland Waste Coalition.

Joseph S. Kaufman, Melnicove, Kaufman, Weiner, Smouse and Garbis, Baltimore, Md., and Charles F. Lettow, Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for SCM Corp.

## OPINION

RAMSEY, District Judge.

The United States brought this action against the SCM Corporation (hereinafter "defendant" or "SCM") at the request of the Administrator of the Environmental Protection Agency (hereinafter "EPA"). The action, brought pursuant to 42 U.S.C. § 7413(b), seeks injunctive relief and the imposition of civil penalties as a result of defendant's alleged violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and the State Implementation Plan approved by the EPA pursuant to the Act. By an Order dated August 14, 1985, the Court permitted Maryland Waste Coalition (hereinafter "MWC"), a local conservation organization, to intervene, pursuant to 42 U.S.C. § 7604(b)(1), in the action brought on behalf of the EPA. MWC's intervening complaint alleges that the interests of its members have been, are being and will be adversely affected by the failure of SCM to comply with State Implementation Plan requirements. MWC seeks declaratory and injunctive relief as well as the costs and fees of bringing its part of this action.

The case was tried before the Court beginning on March 16, 1987. Counsel submitted proposed findings of fact and conclusions of law, and final argument was heard on June 5, 1987. The Court has heard the testimony, carefully examined the exhibits, reviewed the post-trial briefs filed by all parties and considered the final arguments of counsel, and is now prepared to rule. The Court is well aware of its duty under Federal Rule of Civil Procedure

52(a) to find the facts specially and to state separately its conclusions of law thereon. In the event that a conclusion of law or a mixed question of law and fact should be in any way included in factual findings, it is to be treated in its true nature for the purpose of this Opinion. For greater clarity, the Court has altered the usual order of a court opinion to first introduce the Clean Air Act; then set out the findings of fact, followed by questions and conclusions of law.

## I. The Clean Air Act

The Clean Air Act (hereinafter "the Act"), 42 U.S.C. § 7401 *et seq.*, established programs for pollution control involving state and local governments as well as the EPA. The Act provides, *inter alia,* that the EPA establish primary and secondary "national ambient air quality standards" ("NAAQS") for air pollutants having an adverse impact on public health or welfare.[1] 42 U.S.C. § 7409. The Act also requires that each state adopt and submit to the EPA a "State Implementation Plan" ("SIP") to attain and maintain the federally promulgated NAAQS. 42 U.S.C. §§ 7407 and 7410. If a state fails to submit a plan which satisfies the Act's requirements, EPA is authorized to adopt a substitute SIP for the area involved. 42 U.S.C. § 7410(c). If the state-adopted SIP satisfies the requirements of the Act, it is approved by the EPA and may, thereafter, be enforced by both the state and the EPA. If the EPA finds that a person is in violation of a federally approved SIP, the EPA must give notice to both the alleged violator and to the state. If the violation extends beyond the thirtieth day following the required notification, the EPA may order compliance or bring a civil enforcement action. 42 U.S.C. § 7413(a)(1). Such a civil action may be brought in the district court of the United States for the district in which the violation occurred, and the court shall have jurisdiction to restrain the violation, to require compliance, and to assess civil penalties of up to $25,000 per day of violation. 42 U.S.C. § 7413(b).

In 1972, the EPA promulgated primary and secondary NAAQS for particulate matter and other air pollutants. See 40 C.F.R. §§ 50.6 and 50.7. Following the promulgation of those standards, Maryland adopted, and the EPA approved, a Maryland SIP which is published in the Code of Maryland Regulations (COMAR) and in the Code of Federal Regulations. *See* COMAR 10.18.06; 40 C.F.R. Subpart V §§ 52.1070–52.1117. The Maryland SIP, in pertinent part and with exceptions not here relevant, prohibits the discharge of particulate matter in amounts greater than 0.03 grains per standard cubic foot of dry exhaust gas ("gr/SCFD"), COMAR 10.18.06.03(2)(a) (hereinafter the "particulate matter standard"), and further prohibits the emission of sulfuric acid mist in a concentration greater than 70 milligrams per cubic meter of exhaust gas ("mg/m3"), COMAR 10.18.-06.05C(2) (the "sulfuric acid standard"). The emission limits for particulate matter and sulfuric acid mist are intended to be "technology forcing". The violation of these provisions of the Maryland SIP is alleged in the case at bar.

## II. Findings of Fact

### A. SCM Corporation

SCM is a major corporation with operations in chemicals, coatings and resins, paper products, foods and typewriters. SCM Corporation is one of the four leading world producers of titanium dioxide, a white inorganic pigment widely used as a whitener and opacifier in the manufacture of paint, paper, plastic and rubber products. SCM is a leading producer of chemicals derived from crude sulfate turpentine. It is one of the four largest coatings and resins manufacturers in the United States. Company management believes that SCM's sales of "Smith-Corona" electric and electronic typewriters in the United States were greater than those of any other company during the year ended June 30, 1985. SCM had $2.18 billion in net sales for fiscal 1985. The company paid a cash dividend of $2.00 per share in each of the four years

---

1. Primary NAAQS are those "requisite to protect the public health." Secondary NAAQS are those "requisite to protect the public welfare." 42 U.S.C. § 7409(b).

preceding and including 1985. In 1985, total cash dividends equalled $20,000,000.

SCM owns and operates the Adrian Joyce Works in Baltimore, at which titanium dioxide is manufactured both by the sulfate process and by the chloride process. In the sulfate-process manufacturing facility, three calcining kilns are used to process a titanium intermediate, titanium hydrolysate, into crystalline titanium dioxide. Specifically at issue in this case are emissions of particulate matter and sulfuric acid mist from calcining kilns 2 and 3 in light of the Maryland SIP limits for those two pollutants. Emissions from kiln number 1 are not contended to be out of compliance with the Maryland limits for particulates and sulfuric acid mist.

## B. *Early Developments*

SCM's early efforts to achieve compliance with emission standards proved less than successful. Prior to the adoption of Maryland SIP limits on emissions, SCM employed Cottrell electrostatic precipitators ("ESPs"), preceded by cyclones, slot scrubbers, and conditioning towers, to remove pollutants from the gases emitted from kilns 1, 2 and 3. In 1972, after the State's adoption of its SIP limitations, SCM hired Schutte-Koerting, Inc., to evaluate whether venturi scrubbers would be suitable for removing particulate and acid mist from the gases exiting the calcining kilns. Based on the results of Schutte-Koerting's study, the evaluation of SCM's own engineers, and opinions of other experts, SCM concluded that venturi scrubbers could be used to scrub the calciner emissions sufficiently to meet the new SIP limits, and SCM solicited bids from contractors to install such scrubbers.

Poly Con Corporation conducted its own tests of emissions from SCM's calcining kilns and submitted a bid to install venturi scrubbers. Poly Con designed a fixed-throat venturi scrubber system which included a cyclonic separator following the venturi for kiln number 2. It provided the equipment for this system, except the fan, and Poly Con's affiliated construction company made the installation. After the scrubber for kiln 2 was installed, emissions were tested with results in excess of State limits.

Maryland officials approved SCM's plan to install identical Poly Con venturi scrubber systems for kilns 1 and 3, conditioned upon the concurrent installation of a mist eliminator in the cyclonic separator for kiln 3 to determine whether it would improve collection efficiencies. The mist eliminator did not improve collection efficiencies at kiln 3.

During the early and middle–1970's, SCM negotiated a number of compliance plans with the State. SCM's attempts to adhere to plan requirements were not successful. Improvements called for by the various plans were delayed and often ineffective. In 1976, Vincent Mazza, plant manager for SCM's Adrian Joyce Works, asked Leonard Burgess, Senior Process Engineer, to summarize the history of SCM's relationship with the State. Mr. Burgess did so in a memo dated July 28, 1976, and stated that the company viewed the various plans for compliance negotiated with the State as "a means to buy time." In the same memo, Mr. Burgess acknowledged that, with respect to the sulfate installations, "[SCM] didn't regard the plan dates as commandments and worked towards [its] own best interests."

Based on their review of the data from SCM's calcining kilns and their knowledge of other facilities, representatives of Poly Con (and its successor corporation, Environmental Elements) concluded in or about January, 1977, that SCM's venturi scrubbers operating at 45 in. water gauge pressure drop represented the best state-of-the-art equipment available; that the addition of a mist eliminator did not improve emission results; that the exhaust gases out of the stack exhibited virtually zero opacity; and that no further improvements were feasible. Poly Con recommended that Maryland grant SCM a waiver of the emission limits and accept the venturi scrubbers "as is."

Maryland officials rejected Environmental Elements' proposal to grant SCM a waiver and instead pressed SCM to explore

other technological options and to conduct a particle size evaluation. Rossnagel & Associates was retained to conduct a particle size evaluation foremissions from calcining kiln number 2. The evaluation was performed and a report was made in July, 1977.

SCM explored various means of improving the performance of the control system at the calciners, including the reduction of the solids and acid content of the scrub water used in the high-energy venturis. Based on experimentation at kilns 1 and 2, SCM concluded that its ability to meet the Maryland no-visible-emission limit specified in COMAR 10.18.06.02C(2), and correspondingly, the particulate and acid mist limits, was enhanced by maintaining the solids and acid contents of the venturi scrub water to less than 10 grams per liter each. By September, 1977, SCM had installed equipment to maintain scrub water concentrations of less than 10 grams per liter of solids and 10 grams per liter of acid for all three calciner venturi scrubbers.

SCM requested that Maryland accept the venturi scrubbers as best available technology and as satisfying State emission requirements. Maryland officials deferred making a decision on SCM's request pending completion of a study to be conducted by EPA, at Maryland's request, concerning the state of the art for scrubbers for titanium dioxide calcining kilns.

### C. *The GCA Report*

Having received Maryland's request for assistance in late 1977, EPA responded by contracting with GCA Technology Division for GCA to conduct a study of the emission control technology employed and the results obtained by SCM and its competitors in the titanium dioxide industry. GCA was to study the technology used in other industries and the emerging technologies evidenced by literature and contacts with equipment manufacturers and vendors. EPA asked GCA to make recommendations whether SCM's technology could be mod-

ified to achieve Maryland particulate emission limits more consistently.

In December, 1978, while State officials were waiting for the results of the EPA study, plant manager Vincent Mazza established a task force to identify issues relevant to environmental controls and to recommend and cause the implementation of improvements the task force might develop. Among the recommendations made by the task force and thereafter implemented concerning the calciners were the development and use of more detailed preventative maintenance procedures, the replacement of the common stack used for emissions from calcining kilns 2 and 3, and the purchase and installation of spare pumps.

The GCA study was conducted by Peter H. Anderson and Hans A. Klemm. GCA issued a report of its findings in March, 1979.[2] With respect to their survey of SCM's competitors' plants, the GCA report revealed that there were four such plants in the United States, two of which employed venturi technology and two of which did not. Of the competitors' plants surveyed, only one, American Cyanamid, had shown test results below the Maryland particulate limit, but, for the two kilns at the American Cyanamid facility, each had results within the 0.03 gr/SCFD range for only one out of four previous tests. None of the other competitors had been able to control particulate emissions to within 0.03 gr/SCFD by 1979. Those companies' sulfate plants have since closed.

With respect to other existing and emerging control technologies, GCA found that by 1979 several vendors were able to supply other gas scrubbing equipment that could conceptually be applied at SCM's calcining kilns. However, no vendor could assure that its equipment would satisfy Maryland's emission limits. In addition, the efficiency claims of the vendors and actual experience with their equipment indicated that commercially available equipment in 1979 was no better able than SCM's equipment to remove particulate

**2.** The GCA report was not provided to SCM because, among other things, it contained confidential information regarding SCM's competitors. But SCM was made aware of the substance of the report.

matter and sulfuric acid mist. In view of the data existing at the time, the GCA report concluded that "it cannot be unequivocally stated that Glidden-Durkee [SCM] is not using the best available control equipment."

The GCA report commented that because of cyclonic flow during stack testing it was not possible to determine whether emissions from SCM's kilns satisfied State limits or not, and it suggested that further stack tests be conducted under conditions of non-cyclonic flow or that measures be taken during testing to compensate for the presence of cyclonic flow. If such further emission tests indicated rates exceeding the SIP limits, the GCA report recommended that the following be tried to help determine the factors affecting the emission results: (1) "Increase pressure drop (if possible with existing fan) across Venturis"; (2) use the ESP's along with the Venturis; (3) test while using scrub water with no solids or acid present; and (4) test while the kiln is empty. The report advised that "[s]ince testing could prove to be costly, simple observation of the plume opacity may be sufficient to indicate whether or not the above-mentioned modifications affect the emissions to any extent."

State officials did not adopt GCA's recommendations. Instead, State officials asked that SCM cooperate with the State in testing emissions in relation to the solids and acid content of the venturi scrubber water.

### D. Cyclonic Flow

In 1981, after a change in the State's stack test procedures, Maryland officials notified SCM that the State wanted SCM to explore whether alternative test procedures could be used to compensate for the cyclonic flow present in the common stack for calcining kilns 2 and 3.

SCM worked with State personnel to use modified test procedures. However, in the State's view, the alternative procedures did not compensate adequately for the cyclonic flow. As a result, the State asked SCM to modify the ductwork at the entry to the common stack for kilns 2 and 3 to eliminate cyclonic flow in the stack. SCM agreed to eliminate cyclonic flow in the stack. When it replaced the stack in 1981, it installed vanes, referred to as guide, turning, or straightening vanes, in the ductwork entering the stack and up into the base of the stack. Cyclonic flow had been of benefit in controlling emissions. The cyclonic action in the stack caused water droplets containing acid and particulate matter to impinge on the stack wall and drain down and out of the stack, thereby reducing particulate and acid mist emissions.

### E. The Waste Heat Recycle System

Throughout the 1970's, SCM operated the calcining kilns and their control systems in accord with the design criteria for them. However, shortly after Vincent Mazza became plant manager in September, 1975, he assigned SCM's project engineers the task of developing a system for conserving energy at the calciners by recycling some of the hot gases being emitted. The calcining kilns had required two incoming air flows. Primary air was used for purposes of combustion. Secondary air was ambient air which was heated and used for mass transfer of heat through the kilns. The waste heat recycle system developed by SCM uses the recycled air to supplant completely the use of ambient air for secondary flow. Because the recycled gas is already at an elevated temperature, the system conserves substantial amounts of energy.

In conjunction with the design of the waste heat recycle system, SCM engineers designed adjustable throat sections for the venturis for each of the three kilns. As the heat recycle systems were installed in the period 1980–81, adjustable throat sections on the venturis were installed. The variable throats allowed the kiln operator, as conditions changed, to vary the size of the constriction posed by the venturi to assure proper pressure drop across the venturi for scrubbing purposes. In 1982 and 1983, SCM designed and installed systems to automate the positioning of the venturi throats.

## F. *The State Enforcement Proceeding*

After installation of the waste heat recycle systems and the variable throat venturis, as well as the straightening vanes, SCM and Maryland officials conducted extensive tests of emissions from the kilns. On May 20, 25, 26 and 27, 1982, the State of Maryland conducted stack tests with kilns 2 and 3 operating together. The particulate results obtained were 0.101, 0.053 and 0.186 gr/SCFD. The sulfuric acid mist results obtained were 244.7 and 153.3 mg/m3. In January, 1983, the State initiated an enforcement proceeding against SCM respecting emissions of particulate matter and sulfuric acid mist from calcining kilns 2 and 3.

On February 16, 1983, SCM conducted a stack test with kilns 2 and 3 operating together. The particulate matter result obtained was 0.086 gr/SCFD. On February 18, 1983, SCM again tested particulate emissions with kilns 2 and 3 operating together and obtained a result of 0.051 gr/SCFD. Then, in March and April, 1983, State personnel conducted tests on the combined emissions of kilns 2 and 3 operating together and again obtained results indicating emissions exceeded the State limits. On March 17, the State obtained a particulate result of 0.061 gr/SCFD. It obtained results of 0.048 and 0.067 gr/SCFD on March 24. Acid mist results were 275 mg/m3 on March 30 and 219 mg/m3 on April 5. The Chief of the State Air Management Administration's Stationary Source Enforcement Division, Mr. Ronald Lipinski, thereafter wrote to SCM reporting the results of the State's tests and directing that SCM explore technological means to improve emissions results further.

In May and June, 1983, SCM conducted a series of tests on emissions from kilns 2 and 3 individually and in combination and experimented with varying the liquid to gas ratios. The results of the May and June, 1983, tests indicated that emissions from kilns 2 and 3, individually and combined, were within State limits provided that SCM operated the venturi for kiln 3 at the higher end of the design range for liquid to gas ratios. SCM's plant manager, Dr. Donald Knapp, reported these results to Mr. Lipinski in a letter dated June 8, 1983, and suggested that representatives of SCM meet with State and EPA officials to discuss the significance of the various test results obtained during 1982 and 1983.

Such a meeting was held on July 21, 1983. Representatives of the State, EPA and SCM attended. At that meeting, SCM agreed to hire an independent contractor approved by the State to conduct emission tests at kilns 2 and 3 to determine if the emissions complied with State limits. As requested by the State, SCM agreed that this testing would include at least three test runs for each kiln separately and three test runs for the two kilns combined, and that the kilns would be operated during the tests at not less than 85% of maximum capacity. It was agreed by all parties that the results of the emission tests would be accepted by all parties as determinative of SCM's compliance or non-compliance with the applicable State regulations.

SCM hired Roy F. Weston, Inc. to perform the stack tests. Between December 5th and 9th, 1983, Weston conducted nine test runs at kilns 2 and 3. The results of all nine runs and the respective three-run averages showed emissions in excess of State limits for particulates and acid mist:

| Kiln Number | Date | Particulate Matter (gr/SCFD) | Sulfuric Acid Mist (mg/m3) |
|---|---|---|---|
| 2 | 12/05/83 | 0.060 | 130 |
| 2 | 12/05/83 | 0.060 | 1300[3] |
| 2 | 12/07/83 | 0.047 | 160 |
| 3 | 12/06/83 | 0.096 | 260 |
| 3 | 12/06/83 | 0.10 | 270 |
| 3 | 12/06/83 | 0.10 | 220 |
| 2 and 3 | 12/08/83 | 0.088 | 330 |
| 2 and 3 | 12/08/83 | 0.060 | 290 |
| 2 and 3 | 12/09/83 | 0.070 | 320 |

SCM had tested kilns 2 and 3 operating together shortly before the Weston tests were conducted. On October 26, 1983, SCM obtained particulate results of 0.035 gr/SCFD and acid mist results of 88.4 mg/m3. On November 22, 1983, SCM obtained particulate results of 0.121 gr/SCFD and sulfuric acid mist results of 308 mg/m3.

SCM personnel met with Maryland officials in March, 1984, to discuss the Weston results. The Maryland officials suggested that SCM consider a different type of mist eliminator(s) to help reduce emissions. At the March meeting, SCM noted the adverse effect on emissions resulting from installation of straightening vanes at the common stack. The possibility of removing the straightening vanes was discussed. SCM was advised that the Air Management Administration ("AMA") was considering assessing a civil penalty based on the Weston results.

Maryland and SCM representatives met again in June, 1984, and at that time the parties explored the possibility of removing the straightening vanes and using a mist eliminator both to remove droplets and to reduce cyclonic flow. SCM was directed to report to the AMA on this possibility within the next month. In a letter dated July 6, 1984, from Dr. Knapp to AMA Director George P. Ferreri, SCM proposed to install a mist eliminator in the stack serving kiln 1 to determine whether it could be effective in reducing emissions and also in eliminating cyclonic flow. If the experiement in the number 1 stack proved successful, SCM proposed to modify the common stack for kilns 2 and 3 so that a similar demister could be installed. That would involve enlarging the diameter at the base of the stack and also eliminating the straightening vanes.

The Maryland AMA responded to SCM's proposal in a letter dated August 29, 1984, from Mr. Ferreri to Dr. Knapp. A copy of the letter was sent to Thomas Maslany, Air Enforcement Branch Chief, EPA Region III. The AMA accepted in principle SCM's proposal to install a mist eliminator in the number 1 stack as an experiment and then, if appropriate, to modify the common stack for kilns 2 and 3 and to install a mist eliminator there. Mr. Ferreri appended a copy of the form of application for a permit to construct. Mr. Ferreri's letter of August 29 concluded by advising SCM that EPA was "considering enforcement action, which may include filing a case in Federal District Court. Therefore, an expeditious resolution with the State would be in the Company's best interest."

Subsequently, at a meeting on October 2, 1984, representatives of SCM and AMA further refined and explicated the agreement in principle evidenced by Dr. Knapp's July 6 letter and Mr. Ferreri's August 29 letter. In a letter to Mr. Ferreri, dated October 30, 1984, counsel for SCM set out the understandings reached during the October 2 meeting. The letter included a detailed schedule for the implementation of SCM's proposal for the installation of demisters first in the number 1 stack and then in the common stack for kilns 2 and 3.

At a meeting on December 18, 1984, substantive agreement was reached on a Consent Order incorporating the terms outlined in the October 30 letter and also providing

**3.** The second sulfuric acid mist result for kiln 2 on December 5, 1983, is an outlier.

for both an initial civil penalty payment and subsequent stipulated civil penalty payments for failure to meet certain milestone dates. The State Consent Order was entered on January 7, 1985. It required SCM to pay an initial civil penalty of $5,000 and to make a $10,000 contribution to Johns Hopkins University for the benefit of the AMA.

### G. *Action by the EPA*

On April 20, 1984, EPA Region III issued a Notice of Violation ("NOV") to SCM based on the December, 1983, Weston tests. The NOV invited SCM "to submit a compliance plan or a copy of any agreement that you are currently negotiating with the State ... for consideration by EPA," and advised that "[t]he contents of any such plan will be reviewed and EPA will contact you as soon as possible."

SCM responded to the NOV by a letter dated May 18, 1984, from Dr. Knapp to W. Ray Cunningham, Air Management Division Director in EPA Region III. Dr. Knapp's letter advised EPA of the meeting on March 29, 1984, between SCM and Maryland officials and identified the topics then under discussion with the State.

Mr. Cunningham, in a letter to SCM dated May 29, 1984, asked SCM for information relative to any changes in operation of kilns 2 and 3 since the NOV was sent, "whether any formal agreements have been entered" with Maryland, and "any other information that you believe will aid in our review of the calcining kilns." By a letter dated June 15, 1984, to Mr. Cunningham, Dr. Knapp responded to the request for information. Dr. Knapp's letter informed EPA that SCM and Maryland representatives had met on June 11, 1984, and had reached an agreement for SCM to develop a proposal by July 15 to remove the straightening vanes from the common stack, to relocate the demister in the common stack to induce non-cyclonic flow, possibly to install a different type of demister, and to test emission concentrations from kilns 2 and 3 after these steps were taken. SCM thereafter sent to EPA a copy of Dr. Knapp's July 6, 1984, letter to Mr. Ferreri

in which SCM's proposal to this effect was made. Maryland sent to EPA a copy of Mr. Ferreri's letter of August 29, 1984, to Dr. Knapp in which Maryland accepted SCM's proposal in principle.

EPA referred the SCM matter to the Department of Justice for initiation of a civil enforcement action on September 30, 1984. On October 11, 1984, Joseph Kunz and Gregory Ham, the EPA personnel involved in following developments respecting kilns 2 and 3, first visited SCM's plant.

During the plant visit on October 11, Mr. Kunz and Mr. Ham delivered to SCM a thirteen-part questionnaire concerning past, present, and future emission control measures at calcining kilns 1, 2, and 3. By letter from Dr. Knapp dated October 23, 1984, SCM responded to the questionnaire. Dr. Knapp's October 23 letter provided EPA with information about SCM's progress with respect to installation of a demister for kiln 1 and its plans for a similar installation for kilns 2 and 3.

Although Maryland and SCM had not yet reduced their agreement in principle to a written consent order, on October 18, 1984, SCM applied to Maryland AMA for a permit to construct the demister contemplated for kiln 1. Dr. Knapp supplied EPA with a copy of the permit application, as an attachment to his October 23 letter to Mr. Cunningham.

On December 20, 1984, a conference call was held between Thomas Maslany, Joseph Kunz, and Gregory Ham for EPA, and George Ferreri and others for Maryland, during which emissions from SCM's kilns were discussed. This conference call was one of the routine, regularly held discussions between officials of EPA Region III and Maryland AMA. During the call, Mr. Ferreri asked EPA to delay filing suit to allow Maryland time to enter a Consent Order, which was close to completion, but EPA refused.

The United States brought this action against SCM on January 2, 1985.

### H. *Recent Developments*

SCM timely paid the $5,000 civil penalty to the State of Maryland and made the

$10,000 contribution to Johns Hopkins University to support work for Maryland air regulatory programs. SCM installed a mist eliminator in the number 1 stack and performed a stack test on emissions from kiln 1 by April 30, 1985, as specified in the Consent Order.

SCM had represented to the State during negotiation of the Consent Order that a Kimre pad-type demister would be used, and SCM did install a Kimre demister pad in the stack for kiln 1. But once installed, the Kimre mist eliminator proved problematic and diminished the effectiveness of the venturi. To overcome the problems, SCM experimented with the demister and the overall system for kiln 1. Rather than redesign the common stack and install a mist eliminator there, which approach had proved problematic for kiln 1, SCM evaluated the results of its experimentation with kiln 1 and concluded that mist eliminators could be installed in the cyclonic separators serving kilns 2 and 3. SCM further determined that the Kimre design could not feasibly be employed, but instead selected and installed Munters Chevron-type mist eliminators, with associated vortex breakers, in the cyclonic separators for kilns 2 and 3.

Roy F. Weston, Inc., performed stack tests of emissions from kilns 2 and 3 on January 28th through 30th, 1986. The Weston tests demonstrated that emissions from kilns 2 and 3 complied with the State limits for particulates, and that emissions from kiln 3 complied with the acid mist limits. The acid mist results for kiln 2 were 118.8 mg/m3 on January 29, 1986, and 163.1 mg/m3 on January 30, 1986. A second run on January 30, showed results within SIP limits for acid mist at kiln 2.

Weston conducted stack tests of emissions on kiln 2 on March 20 and 21, 1986, and reported results within the State limits for sulfuric acid mist, with the exception of one run on March 21 which obtained results of 104.6 mg/m3. Weston conducted stack tests of the combined emissions from kilns 2 and 3 on May 29 and 31, 1986. The particulate emissions showed average test results for the three runs within the State limit, but the average acid mist emissions for the three runs exceeded the State limits. The May 29 run showed acid mist results of 121.0 mg/m3 and the May 31 run showed results of 70.9 mg/m3.

In or about June, 1986, SCM began construction on a project to replace and revise certain aspects of the process and emission control equipment at kiln 3. Among other things, SCM removed the slot scrubber and conditioning tower for kiln 3 and replaced them with a low-energy venturi and a new conditioning tower with a packed section. Data developed through experimentation with kiln 1 during 1985 were used by SCM's engineers in designing the slot scrubber and conditioning tower replacements and in making other associated changes to the calciner burners, the heat recycle system, the induced draft fan, and the scrubber water flow system. The changes to the number 3 system included the installation of new electronic and computer-based monitoring and control instruments for both process and emission control equipment. SCM expects to revise the system for kiln 2 in a manner similar to the system for kiln 3.

On February 18 and 19, 1987, following replacement of the number 3 slot scrubber and conditioning tower, Weston conducted stack tests of the emissions from kiln 3. The results of the February, 1987, tests demonstrate that emissions from kiln 3 comply with the State limits on particulates and sulfuric acid mist. The average particulate matter result obtained for the three runs conducted was 0.0039 gr/SCFD, and the average acid mist result for three runs was 30.9 mg/m3.

On March 11, 1987, the Maryland AMA issued Operating Permits to SCM for calcining kilns 1, 2 and 3. The permits authorize actual production rates up to and including 82 tons per day at kiln 1, 63 tons per day at kiln 2, and 82 tons per day at kiln 3. These production rates correspond to the rates during Weston stack tests on the kilns in March 1986, December 1986, and February 1987. They require monitoring and recording of, among other things, production rates, pressure drop across the

high-energy venturis, and water flows to the venturis.

### I. *Health Effects*

The Court heard testimony by a number of expert witnesses regarding alleged environmental and health hazards associated with SCM's discharges. The Court is not convinced that emissions from SCM's calcining kilns do now, did in the past, or will in the future present a significant health hazard.

David Swift, Ph.D., reviewed the December, 1983, and January, 1986, Weston Reports, the particle size analysis and inspected the area in and around the SCM Hawkins Point Plant. Based on the December, 1983, and January, 1986, Weston emission data, and assuming various windspeeds and conditions of plumerise and no plumerise, Dr. Swift opined that the resulting ground level concentrations of sulfuric acid constituted a public health hazard because they would lead to adverse health effects.

Dr. Robert Frank, an expert in the field of health effects associated with breathing sulfuric acid and heavy metals, reviewed the video deposition of Dr. Swift, inspected the SCM plant and reviewed the particle size analysis. Dr. Frank opined that the range of concentrations in the Swift air dispersion model constitute a significant hazard to the public health.

Hugh T. Spencer, Sc.D., an expert in the field of chemical engineering and environmental surveys, expressed the opinion that the court should recommend an environmental survey which would help SCM to evaluate the risks associated with its discharges in the past and the risks associated with its discharges in the future. In the first phase of the survey, a consulting firm would take aerial photographs of the area surrounding the plant in the spring, summer, fall and winter. SCM would construct a wind tower which would allow them to collect wind data at the SCM plant. Finally, the consulting firm would take soil samples within two kilometers of the plant. Dr. Spencer estimated that this first phase of the survey would cost approximately $100,000. After SCM evaluated the data

from the first phase of the survey, SCM could make reasonable and accurate predictions of what the concentrations of sulfuric acid were at ground level in the past and what they will be in the future.

The Court finds that Dr. Swift's ground level concentration results are unreliable and do not represent actual scenarios likely to have occurred, likely to be occurring now or likely to occur in the future. His concentration results are based on the highest test run figures obtained during the December, 1983, and January, 1986, Weston stack tests. With respect to the December, 1983, tests, this was the second test run at kiln 2 on December 5, 1983, which was reported as 1300 mg/m3 or 81 lb/hr, as a result this Court has found is an outlier and unreliable. With respect to the January, 1986, tests, Dr. Swift relied on the highest emission rate from kiln 2, when subsequent tests showed representative emissions from kiln 2 are approximately one-third of the value he used.

Each of the emission cases determined by Dr. Swift is entirely hypothetical. Apart from the fact that the emission rates used as a basis are not well founded, every other aspect of his work is assumed. He did not use or take account of actual data regarding meteorological conditions, actual stack gas exit velocity, actual stack gas temperature, nearby building dimensions, local terrain configurations or land use. Dr. Swift did not and could not predict the duration or frequency of occurrence of the concentrations he estimated.

Doctors Bruce A. Egan and Michael T. Mills of Environmental Research and Technology, Inc. also made calculations in order to predict ambient concentrations resulting from the emission of sulfuric acid mist from the calcining kilns. Egan and Mills used emission rates from the Weston Tests of December, 1983 (with the exception of run 2 on kiln 2 on December 5, 1983), emission rates from Weston tests at kiln 1 in December, 1985, emission rates from SCM-conducted stack tests at kilns 2 and 3 in 1983–84, emission rates equal to the 70 mg/m3 SIP limit for acid mist, and emission rates obtained at kiln 1 by Weston in

December, 1986, at kiln 2 by Weston in March, 1986, and at kiln 3 in January, 1986, and February, 1987.

Unlike Dr. Swift, Drs. Egan and Mills used actual, observed data concerning stack heights, stack base elevation, stack location, stack gas exit velocity, stack gas temperature, and nearby building dimensions. Egan and Mills also used actual hourly meteorological data for every hour of the five-year period 1975–79 from Baltimore-Washington International Airport and from Dulles Airport, in Virginia.

Dr. Mark J. Utell reviewed the concentration results obtained by Doctors Egan and Mills to assess potential health effects. Dr. Utell provided that a conservative estimate of the ambient concentration at which sulfuric acid mist could have an adverse effect on some member of the population would be 100 micrograms per cubic meter ("ug/m3"), and the particular subpopulation at risk at that level would be exercising adolescent asthmatics.

The modeled emissions for only one emission case, involving the Weston 1983 data, ever resulted in any period of ambient concentrations exceeding 100 ug/m3, and at no time were the predicted ambient concentrations in excess of 200 ug/m3. The few instances in which emissions were predicted to exceed 100 ug/m3 were for individual one-hour periods. Eight-hour and longer averaging times for concentrations based on Weston 1983 data and all times for concentrations based on the more recent emissions data showed ambient concentrations less than 100 ug/m3. The highest annual average ambient concentration predicted for any year was 2.74 ug/m3.

On the whole, the evidence suggests that if an adolescent asthmatic were present at one of areas where the highest concentrations were predicted on an occasion when the ambient concentration exceeded 100 ug/m3, if the adolescent were exercising, and if both the concentration remained about 100 ug/m3 and the adolescent remained at the site for over one hour, the individual might be subject to an adverse effect, but such effect would not be noticeable to the individual and would be transitory (reversible in a very short period of time). In short, the potential for any adverse health effect, even under the case represented by the December, 1983, Weston tests, is remote. The potential for adverse health effects having arisen under the other emission conditions—the average of the SCM tests in 1983–84, the regulatory limit, or present operating conditions—was shown to be virtually non-existent.[4]

### III. Questions of Law

This case presents two important questions of law that must be addressed before the Court can apply the statutory scheme of the Clean Air Act to the facts found.

### A. The Appropriate Penalty Period

Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), provides in pertinent part:

The Administrator shall, in the case of any person which is the owner or operator of a major stationary source, and may, in the case of any other person, commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day of violation, or both, whenever such person—

... (2) violates any requirement of an applicable implementation plan ... (B) more than 30 days after having been notified by the Administrator under subsection (a)(1) of this section of a finding that such person is violating such requirement. ...

SCM contends that section 7413(b)(2)(B) permits the EPA to obtain penalties only for the period commencing 31 days after the issuance of a Notice of Violation. In this case, the relevant period would begin after May 20, 1984. EPA argues that when the NOV was issued has no bearing on the period for which EPA can collect penalties. The Agency views the issuance of the NOV and the 30–day continuing violation period as a jurisdictional threshold

---

**4.** No evidence was presented that would tend to indicate that emissions from calcining kilns 2 and 3, whether above or below the SIP limit, have caused any environmental harm.

which must be reached in order for EPA to maintain a suit for civil penalties.[5]

EPA supports its interpretation by reference to its "civil penalty policy," a document used by the Agency in computing the minimum penalty the Agency will accept in settlement of enforcement actions under the Clean Air Act. That policy states that "for the purposes of computing both the statutory maximum penalty and the minimum settlement amount, the period of noncompliance begins with the earliest provable day of violation and ends with the projected date of compliance." EPA also believes that the plain language of the statute and the intent of the legislature support the view that issuance of the NOV does not affect the penalty period. Finally, the EPA refers the Court to two recent Clean Air Act cases where federal district courts imposed penalties for each day the government proved that the source operated in violation of the applicable SIP, including days prior to the NOV.

■ The Court finds that civil penalties are available for days of violation occurring prior to the issuance of the NOV. Section 7413(b)(2)(B) is silent as to the date on which the penalty period begins, but other relevant factors support assessment of penalties for pre–NOV violations. The Court does not find the language of section 7413 to be as "plain" and "unambiguous" as EPA suggests. However, the Court finds that the availability of penalties for pre–NOV violations supports the purposes of the Clean Air Act, enhances the Court's discretion to fashion an appropriate penalty, and is consistent with the decisions of other federal courts.

It is fair to say that the overriding objective of Congress in enacting and amending the Clean Air Act is the abatement and control of air pollution through systematic and timely attainment of air quality standards. *See Friends of the Earth v. Carey*, 535 F.2d 165, 169 (2d Cir.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). One express purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The availability of penalties for pre–NOV violations furthers that purpose.

The civil penalty provisions of the Act provide incentive to the violator to expeditiously resolve emissions violations. A violating source can avoid civil penalties if it ceases violation within 30 days of the NOV. Failure to comply within 30 days can result in the assessment of substantial penalties for each day of violation. The availability of penalties for pre–NOV violations enhances the incentive to resolve emission problems. More importantly, it provides incentive to avoid violations all together. Assessment of civil penalties for post–NOV violations only allows the source to wait until it is caught before making serious efforts to "clean up its act." Once the NOV is issued, the violating source could perform a cost/benefit analysis, weighing the benefits of operating in violation, without expenditures for further pollution control, against the potential cost of $25,000 per day of violation; a cost that may never be realized or at best will be collected only after an uncertain and time consuming litigation process. Such a practice is certainly not consistent with Congress' Clean Air objectives. Potential penalties for pre–NOV violations add a substantial and less calculable weight to the cost side of the analysis.

Additional support for pre–NOV penalties exists. Congress intended the Courts to exercise substantial discretion in fash-

---

5. EPA contends that SCM continued to violate Maryland SIP limits more than 30 days after the issuance of the NOV. It cites as support for its position a May 29, 1984, letter from W. Ray Cunningham to D. George Harris and an October 10, 1984, letter from Mr. Cunningham to Dr. Donald Knapp. Neither of these documents in any way establish the existence of post-NOV violations. They simply solicit information from SCM which EPA expected would demonstrate compliance or a lack thereof. The Court has found only five proven daily violations of the applicable SIP limits since issuance of the NOV on April 20, 1984. They occurred on January 29 and 30, 1986, March 21, 1986, and May 29 and 31, 1986, and involved violations of the sulfuric acid mist limit at kilns 2 and 3.

ioning an appropriate civil penalty. It set a maximum of $25,000 for each day of violation, but counseled the courts to consider the size of the business, the economic impact of the penalty on the business, and the seriousness of the violation. 42 U.S.C. § 7413(b). Broadening the available penalty period to include days prior to issuance of the NOV enhances the court's discretion to fix an appropriate penalty.

Lastly, the Court has considered two recent decisions where civil penalties were assessed for pre–NOV violations. *See United States v. Chevron U.S.A., Inc.*, 639 F.Supp. 770 (W.D.Tex.1985) *and United States v. Kaiser Steel Corp.*, No. 82–2623–IH (C.D.Cal. Jan. 26, 1984). Of course decisions out of the Western District of Texas and the Central District of California are not binding on this Court. Furthermore, the *Chevron* and *Kaiser Steel* courts apparently assessed penalties for pre–NOV violations without questioning the propriety of such an assessment. However, SCM has not referred the Court, and the Court has not found, any case where the assessment of pre–NOV penalties was considered but refused. The Court recognizes the benefit of consistent construction of the Clean Air Act penalty provisions and where, as here, the construction of the Act by other Courts is in accord with the purposes of the Act, this Court is inclined to adopt a similar construction.

EPA suggests that SCM has been in violation of the Maryland SIP provisions for particulate matter and sulfuric acid mist emissions at kilns 2 and 3 continuously from the effective date of the SIP to the present. Accordingly, and consonant with its interpretation of the civil penalties provision of the Act, EPA contends that this Court may properly assess a penalty in the amount of $50,000 per day (for two violations) for each day between August 7, 1977, (the effective date of the Clean Air Act amendment that provided for civil penalties of $25,000 per day) and the present.

■ The Court has held that civil penalties may be assessed for days of violation occurring prior to the issuance of a notice of violation. It does not follow, however, that EPA may recover penalties from August 7, 1977, to the present. 28 U.S.C. § 2462 provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

The five-year federal statute of limitations found in section 2462 has been held to apply to citizen suits for civil penalties as well as government actions for civil penalties under the Clean Water Act. *See, e.g., Atlantic States Legal Foundation v. Al Tech Specialty Steel Corp.*, 635 F.Supp. 284, 287 (N.D.N.Y.1986); *Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207, 212–13 (D.Conn.1985); *Sierra Club v. Simkins Industries, Inc.*, 617 F.Supp. 1120, 1124–25 (D.Md.1985); *and Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 446–50 (D.Md.1985). The Court finds no reason why section 2462 should not apply to an action by the government to obtain civil penalties under the Clean Air Act. Accordingly, civil penalties are available for violations occurring within the five years prior to the filing of this action, or from January 2, 1980, to the present.

### B. *The Burden of Proof*

EPA suggests that under the Clean Air Act, once a source is shown to be out of compliance, it has the burden of demonstrating to the State and the EPA that it has achieved compliance. In the alternative, EPA suggests that the government may have the burden of proving continuing violations but it may satisfy that burden by a combination of intermittent testing results. The Court does not agree with either proposition.

EPA has produced test results showing SIP violations obtained at various intervals of time over a period of years. Most of the test results were obtained many months

apart. It argues that there is no evidence that any different situation existed during the days between the dates when the test results were obtained. Therefore, EPA asserts that SCM has been in continuous violation of the Maryland SIP provisions for particulate matter and sulfuric acid mist since the effective date of the SIP.

Support for a similar approach can be found in *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304 (4th Cir.1986), *cert. granted,* — U.S. ——, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987), a Clean Water Act case. In *Gwaltney,* the defendant, Gwaltney of Smithfield ("Gwaltney"), was a holder of a National Pollutant Discharge Elimination System ("NPDES") permit. Such permits are issued pursuant to procedures and regulations under the Clean Water Act, and allow permit holders to discharge various pollutants into navigable waters. Gwaltney's permit fixed both "daily" and "monthly average" discharge limits for certain named pollutants. *Id.* at 307. Permittees are required to submit discharge monitoring reports ("DMRs"), and Gwaltney's DMRs reported a number of violations of "monthly average" permit limits. The district court held that a violation of a monthly limitation is equivalent to a daily violation for each day of that month. *Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 611 F.Supp. 1542, 1552–53 (E.D.Va.1985). The appellate court agreed.

In addition to monthly averages violations, there were a number of violations of daily standards in months when no violations of monthly averages occurred. Gwaltney's DMRs did not indicate on which day of the month a given violation occurred, and it was possible that some violations occurred on the same day. The district court held that it was permissible to shift the burden of proof to the defendant to demonstrate that there was some "overlap" of violations of daily limitations, in order to reduce the total number of days of violation. *Id.* at 1556. Again, the appellate court agreed.

This case differs from *Gwaltney* in respects that make the burden of proof approach used in that case inapplicable here. This case does not involve monthly average limits. More importantly, this case does not involve a permit holder which is required by statute or regulations to monitor its emissions and report them through DMRs. The Clean Air Act and Maryland's SIP authorize the administrator of the EPA and the Department of Health and Mental Hygiene to require a source to monitor and report its emissions. *See* 42 U.S.C. § 7414 *and* COMAR 10.18.01.04B(1). But sources are not otherwise required to test emissions on any periodic basis. It is the monitoring and reporting requirements of the Clean Water Act that justified the shift of the burden of proof and the presumptions employed in *Gwaltney.* "[T]he Act itself places on the permit-holder a burden of showing compliance with the permit's limitations." *Gwaltney,* 791 F.2d at 316. The Clean Air Act does not place such a burden on SCM.

■ In an enforcement proceeding under the Clean Air Act, the burden of establishing a violation of the applicable regulation is on the government. *See Getty Oil Co. v. Ruckelshaus,* 467 F.2d 349, 357 (3d Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973) (citing *United States v. Bishop Processing Co.,* 423 F.2d 469, 473 (4th Cir.1970), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1695, 26 L.Ed.2d 63 (1970)); *Chevron U.S.A., Inc.,* 639 F.Supp. at 777; and *Kaiser Steel Corp.,* No. 82–2623–IH, slip op. at ——. In *Chevron,* the court placed on plaintiffs, the United States and the State of Texas and City of El Paso, the burden of proving by a preponderance of the evidence each date on which defendant had violated applicable regulations. Likewise, in *Kaiser Steel,* the Court found that the government had proven a total of 33 violations, by date and time of violation. This Court finds no reason to depart from that approach in the case at hand.

■ EPA maintains that it would not be possible to nail down proof for each day of a claimed continuous violation. The Court agrees. However, EPA had available to it

a suitable means to avoid its proof problems. 42 U.S.C. § 7414(a) provides that the administrator may require any person who owns or operates any emission source to sample such emissions (in accordance with such methods, at such locations, at such intervals, and in such manner as the administrator shall prescribe) for the purpose of determining whether any person is in violation of an emission standard or implementation plan, or for the purpose of carrying out any provision of the Clean Air Act. *See United States v. Harford Sands, Inc.,* 575 F.Supp. 733 (D.Md.1983).[6] The government could have used the procedure under section 7414 to obtain sufficient evidence of continuous noncompliance.[7] If the Court had before it test results obtained at some logical and uniform interval, as the *Gwaltney* Court had, it would be more inclined to shift to SCM the burden of proving compliance on the dates between test results. But the government did not utilize the section 7414 process and the Court will not shift the burden of proving compliance to SCM on the basis of relatively few test results obtained at intervals of varying length. Civil penalties will be assessed only for each day of violation proved by plaintiffs.

## IV. *Conclusions of Law*

### A. *Civil Penalties*

Section 7413(b) provides for a civil penalty of not more than $25,000 per day of violation. EPA has proven the following daily violations of Maryland SIP limits for particulate matter from January, 1980, through the present:

| Violation Number | Date | Kiln(s) | Testor |
|---|---|---|---|
| 1. | May 20, 1982 | 2 and 3 | State |
| 2. | May 26, 1982 | 2 and 3 | State |
| 3. | May 27, 1982 | 2 and 3 | State |
| 4. | February 16, 1983 | 2 and 3 | SCM |
| 5. | February 18, 1983 | 2 and 3 | SCM |
| 6. | March 17, 1983 | 2 and 3 | State |
| 7. | March 24, 1983 | 2 and 3 | State |
| 8. | October 26, 1983 | 2 and 3 | SCM |
| 9. | November 22, 1983 | 2 and 3 | SCM |
| 10. | December 5, 1983 | 2 | Weston |
| 11. | December 6, 1983 | 3 | Weston |
| 12. | December 7, 1983 | 2 | Weston |
| 13. | December 8, 1983 | 2 and 3 | Weston |
| 14. | December 9, 1983 | 2 and 3 | Weston |

EPA has proven the following daily violations of Maryland SIP limits for sulfuric acid mist from January, 1980, through the present:

| Violation Number | Date | Kiln(s) | Testor |
|---|---|---|---|
| 1. | May 25, 1982 | 2 and 3 | State |
| 2. | May 27, 1982 | 2 and 3 | State |
| 3. | March 30, 1983 | 2 and 3 | State |
| 4. | April 5, 1983 | 2 and 3 | State |

6. COMAR 10.18.01.04(a)(1) contains a provision similar to section 7414 whereby the Department of Health and Mental Hygiene may require a person to conduct testing to determine compliance with emissions standards.

7. In fact, EPA used its section 7414 authority to elicit information from SCM in the form of responses to two questionnaires, the May 29, 1984, letter from W. Ray Cunningham to D. George Harris and the October 10, 1984, letter from Mr. Cunningham to Dr. Donald Knapp. *See supra* note 3.

| Violation Number | Date | Kiln(s) | Testor |
|---|---|---|---|
| 5. | October 26, 1983 | 2 and 3 | SCM |
| 6. | November 22, 1983 | 2 and 3 | SCM |
| 7. | December 5, 1983 | 2 | Weston |
| 8. | December 7, 1983 | 2 | Weston |
| 9. | December 6, 1983 | 3 | Weston |
| 10. | December 8, 1983 | 2 and 3 | Weston |
| 11. | December 9, 1983 | 2 and 3 | Weston |
| 12. | January 29, 1986 | 2 or 3 [8] | Weston |
| 13. | January 30, 1986 | 2 | Weston |
| 14. | March 21, 1986 | 2 | Weston |
| 15. | May 29, 1986 | 2 and 3 | Weston |
| 16. | May 31, 1986 | 2 and 3 | Weston |

EPA has proven 14 daily violations of the Maryland SIP limits for particulate matter and 16 daily violations of the Maryland SIP limits for sulfuric acid mist during the relevant penalty period. The maximum available civil penalty for the 30 days of proven violations is $750,000 (30 × $25,000).

Having calculated the maximum civil penalty available, other factors must be considered by the court in determining the appropriate penalty to assess. Section 7413(b) directs that the Court take into consideration (in addition to other factors) the size of the business, the economic impact of the penalty on the business, and the seriousness of the violation. In addition to the factors listed in the statute, other Courts have considered technological or economic infeasibility, good faith, or a lack thereof, on the part of the violating source, the violating source's relationship with the state and governmental delay in bringing the action. *See, e.g., Kaiser Steel Corp.,* No. 82–263–IH, slip op. at 23 *and Harford Sands, Inc.,* 575 F.Supp. at 735. The Court will examine each of these factors.

Application of the first two factors, size of the business and economic impact of the penalty, supports the imposition of a substantial penalty. SCM, like Chevron U.S.A., Inc., is a major corporation. "Only a substantial penalty would have any economic impact or serve as any deterrent." *Chevron U.S.A., Inc.,* 639 F.Supp. at 779. Imposition of the entire $750,000 available would result in a penalty equal to less than four percent of the 20 million dollars in cash dividends paid by the company in fiscal 1985.

SCM's violations of the applicable Maryland SIP limits were serious violations. The Court refused to presume, based on the limited test results available, that SCM was in continuous violation of the SIP limits for the purpose of determining days of violation. But, based even on the limited data available, there is little doubt that had stack tests been performed with greater regularity prior to 1986, a substantial number of additional violations might have been identified. The seriousness of SCM's violations is evident, however, even from the relatively few days of violation proved. Test results obtained on the 30 days of proven violations show particulate matter and sulfuric acid mist measurements equal to two, three and four times SIP limits for those pollutants.

■ The court heard considerable testimony and argument throughout the trial of this matter on the issue of technological infeasibility. It should be noted that technological infeasibility is not a complete defense to Clean Air Act violations. *See United States v. Ford Motor Co.,* 814 F.2d 1099, 1103–04 (6th Cir.1987), *petition for cert. filed,* 55 U.S.L.W. 3822 (U.S. May 29, 1987) (No 86–1892); *United States v. Wheeling Pittsburgh Steel Corp.,* 642 F.Supp. 468, 473 (W.D.Pa.1986); *Friends of the Earth v. Potomac Elec. Power Co.,* 419 F.Supp. 528, 535 (D.D.C.1976); *Kaiser Steel Corp.,* No. 82–263–IH, slip op. at 18–19. The Clean Air Act, like Maryland's SIP, is intended to be "technology forcing." *Duquesne Light Co. v. E.P.A.,* 698 F.2d 456, 475 (D.C.Cir.1983); *Friends of the*

---

**8.** Both kilns, operating independently, showed excessive acid mist results on January 29, 1986.

*Earth,* 419 F.Supp. at 535. Technological infeasibility may be considered, however, as a factor mitigating against the imposition of monetary penalties. *Ford Motor Co.,* 814 F.2d at 1104.

In this case, technological infeasibility mitigates, to some extent, against the imposition of a substantial penalty. In its March, 1979, Final Report prepared for EPA, GCA Corporation acknowledged that only one of the four plants in the United States then producing titanium dioxide pigment via the sulfate process employed an emission control system capable of achieving Maryland's 0.03 gr/SCFD standard for particulate matter. The report further notes that "it cannot be unequivocally stated that [SCM] is not using the best available control equipment."

■ Reference to the GCA report, without more, would suggest that technological infeasibility should be a substantial mitigating factor. But several circumstances, in addition to the many disclaimers and qualifiers in the report itself, counsel against placing great weight on the GCA report. Technological infeasibility cannot be examined without a corresponding inquiry into good faith. "[T]he absence of demonstrable good faith efforts toward compliance should serve to dampen any enthusiasm for technological and economic arguments advanced in defense of a claimed violation." *Ford Motor Co.,* 814 F.2d at 1104 (quoting *Indiana & Michigan Elec. Co. v. E.P.A.,* 509 F.2d 839, 845 (7th Cir.1975)). It is evident that at least prior to 1977, SCM dragged its feet, and did not work expeditiously toward compliance. The July 28, 1976, memo from Leonard Burgess characterizes the various air pollution plans of compliance SCM negotiated with the State as a "means to buy time." The memo further admits that SCM did not "regard the plan dates as commandments ... and [SCM] worked toward [its] own best interests." SCM made its most impressive efforts to achieve compliance after the State issued its Notice of Violation in January, 1983.

It should also be noted that the GCA report is dated March, 1979. The Court

has held that the relevant period for assessment of civil penalties in this case did not begin until January, 1980, five years prior to the filing of this action. Accordingly, it is the period from 1980 to the present that should be examined in connection with any claimed technological infeasibility. In the early 1980's SCM's efforts at its Adrian Joyce Works were directed more toward the development and installation of its waste heat recycle system than toward achieving compliance with emission limits. SCM demonstrated its ability to be a leader in the development of new and effective technology with the development and installation of its waste heat recycle system. That same creative energy could have been employed to develop an effective emission control system. Later, when it was forced to do so, after the issuance of the State's NOV in January, 1983, SCM was able to develop in a relatively brief period of time an emission control system capable of achieving State limits for particulate matter and sulfuric acid mist. The Court recognizes that SCM developed the waste heat recycle system at a time when energy conservation was a, if not "the", national priority. However, that does not excuse the failure to meet SIP limits.

In an earlier opinion, disposing of one of the pretrial motions filed in this action, the Court recognized that a violator's relationship with the State may be taken into account by the Court when determining the appropriateness of the relief prayed by plaintiff. *See United States v. SCM Corp.,* 615 F.Supp. 411, 419 (D.Md.1985) (citing *United States v. Harford Sands, Inc.,* 575 F.Supp. 733, 735 (D.Md.1983)). In this case, however, SCM's relationship with the State is entitled to little weight. SCM cooperated with the State when it had to; when it faced the possibility of a time consuming and potentially expensive enforcement action.

■ Finally, some mention of governmental delay should be made. EPA suggests that SCM has been in continuous violation of the Maryland SIP provisions for particulate matter and sulfuric acid mist emissions from the effective date of

the SIP, May 31, 1972, to the present. But EPA issued its NOV on April 20, 1984, and it filed this action in January, 1985. The Court does not believe that the government's delay in bringing this action should mitigate against imposition of a substantial penalty; nor should it act to enhance the penalty amount. Suffice it to say that the threat of this action has evidently encouraged SCM to develop an emission control system capable of achieving State limits on particulate matter and acid mist. Earlier action on the part of EPA may have eliminated years of potentially hazardous air pollution.

Having considered the relevant factors the Court imposes the following penalties:

For the five violations of particulate matter or acid mist limits occurring on days during the period from January, 1980, through January, 1983, the Court imposes $20,000 per violation, for a total of $100,000;

For the 25 violations of particulate matter or acid mist limits occurring on days during the period from February, 1983, through May, 1986, the Court imposes $10,000 per violation, for a total of $250,000;

The total civil penalty imposed shall be $350,000.

### B. *Equitable Relief*

#### 1. Plaintiff United States' Requested Relief

EPA prays that this Court enter an Order enjoining SCM from violating the SIP provisions with respect to particulate matter and sulfuric acid mist at its Adrian Joyce Works. The Court's Order should also require SCM to: (1) Install similar changes to kiln 2 as were installed at kiln 3; (2) hire an independent testing firm to test kiln 2 operating alone at its maximum design rate and operating together with kiln 3 at their maximum design rates; and (3) provide monthly reports to EPA of changes to the kiln control systems and reports of any emission tests conducted by SCM or any other party for a period of one year after tests on kilns 2 and 3 show compliance when the kilns are operating

together. Finally, EPA requests that this Court incorporate in its Order the present operating permits for kilns 2 and 3 and any subsequent permits issued during the requested reporting period, making them federally enforceable.

The Clean Air Act permits EPA to commence a civil action for a permanent or temporary injunction and grants this Court jurisdiction to restrain a violation of an applicable implementation plan or to require compliance with the plan. 42 U.S.C. § 7413(b). But "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

■ SCM argues that where there are no present violations and no cognizable danger of future violations, injunctive relief is inappropriate and should be denied. The Court agrees. "[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct. The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953) (citations omitted).

The parties do not agree whether SCM is presently operating in compliance with the relevant SIP provisions. SCM argues that recent stack tests demonstrate current compliance and there is no real threat of a future violation. EPA counters that SCM is presently out of compliance in that SCM has not shown compliance when kilns 2 and 3 are operating together or with each kiln operating at its maximum production rate.

EPA suggests that the burden is on SCM to show compliance in order to avoid injunctive relief. The Court does not agree that SCM has such a burden. Nevertheless, there is sufficient evidence in the record to adequately demonstrate that SCM is currently operating in compliance with relevant SIP limits and that there are sufficient safeguards in place to diminish the likelihood of future violations.

Stack tests conducted by Roy F. Weston at kiln 3 in February, 1987, obtained results well within SIP limits for particulate matter and sulfuric acid mist for each of the three runs conducted. Stack tests conducted by Roy F. Weston at kiln 2 in January, 1986, obtained results well within SIP limits for particulate matter for each of the three runs conducted. Stack tests conducted by Weston at kiln 2 in March, 1986, show average sulfuric acid mist results within SIP limits. In March 11, 1987, the Maryland AMA issued Operating Permits to SCM for kilns 1, 2 and 3. The permits authorize actual production rates up to and including 82 tons per day at kiln 3 and 63 tons per day at kiln 2. These production rates correspond to the rates during Weston stack tests on the kilns in March, 1986, and February, 1987. There is no evidence that SCM is currently operating in violation of applicable SIP limits or in violation of its operating permits.

The Court is aware that Technical Memoranda describing stack testing methods for stationary sources require that all stack tests be done while the operation is running at "maximum rate capacity as specified by the equipment manufacturer or at the maximum rate actually used in the source operation, whichever is greater." The Court finds, however, that this requirement is illogical as it is literally impossible of fulfillment. More importantly, EPA's expert, Gregory Ham, testified that it is permissible to test at a lower production rate as long as the source is willing to accept the test rate as its upper production limit. Here, operating permits have been issued to SCM that restrict SCM to production rates not in excess of 82 tons per day at kiln 3 and 63 tons per day at kiln 2, the production rates at which SCM has demon-strated compliance. Accordingly, the Court does not find that SCM is presently violating SIP requirements by failing to test at maximum production rates.

EPA claims that SCM continues in violation for failure to demonstrate compliance when kilns 2 and 3 are operating together. In May, 1986, Roy F. Weston conducted stack tests when kilns 2 and 3 were operating together. The particulate matter results for each of the three runs and the average particulate matter result for the three runs were within SIP limits. The sulfuric acid mist result for the second of three runs was within SIP limits. The acid mist results for runs number 1 and 3 and the average result for the three runs exceeded SIP limits. Technical Memoranda describing stack test procedures provide that a test consists of three sample runs on three separate days. Therefore, SCM has not demonstrated compliance with SIP limits for acid mist when kilns 2 and 3 are operating together. But that failure does not convince the Court that injunctive relief is appropriate.

The test results of May, 1986, when kilns 2 and 3 were operating together, were obtained before SCM made the maintenance replacement of the slot scrubber and conditioning tower at kiln 3. Average acid mist results for the three runs conducted at kiln 3 in February, 1987, after the changes to kiln 3, are less than one-half the acid mist results obtained at kiln 3 prior to the changes. Thus, it is unlikely that SCM is presently out of compliance even when kilns 2 and 3 are operating together, and, given the modifications to kiln 3 and expected changes to kiln 2, there is no cognizable danger of recurrent violations. There is, at best, a mere possibility that SCM may violate sulfuric acid mist limits when kilns 2 and 3 are operating together. Such a mere possibility is not sufficient to support the imposition of injunctive relief.

EPA has asked the Court to order that SCM install similar changes at kiln 2 as were installed at kiln 3. The Court does not find it necessary to order that such changes be made. SCM has represented that it intends to make the requested

changes. Furthermore, SCM is currently operating under a permit which prohibits production rates in excess of 63 tons per day at kiln 2. The permit provides that production rate limits may be modified in subsequent permits to reflect results of future stack emission tests. If SCM wishes to operate kiln 2 at a rate similar to that permitted at kiln 3, 82 tons per day, it will have to make similar modifications to the kiln 2 emission control system and demonstrate compliance at the increased production rates. Otherwise, SCM will be limited to 63 tons per day at kiln 2, a rate at which it is capable of SIP limit compliance.

Finally, the Court will not incorporate in its Order the present or any subsequent operating permits for kilns 2 and 3. Incorporation into this Court's Order is not required in order to make the permits federally enforceable. Failure to abide by the terms of an operating permit constitutes a violation of Maryland's SIP. *See* COMAR 10.18.02.03F. Such a violation can be the subject of a civil enforcement action under 42 U.S.C. § 7413(b) or a citizen suit pursuant to 42 U.S.C. § 7604(a)(1). *See People of the State of Illinois v. Commonwealth Edison Co.*, 490 F.Supp. 1145, 1150 (N.D. Ill.1980).

Accordingly, the Court will deny all aspects of injunctive relief requested by EPA.

2. Intervening Plaintiff Maryland Waste Coalition's Requested Relief

■ Intervening plaintiff Maryland Waste Coalition prays that this Court order an environmental survey in this case as described by Dr. Spencer. MWC contends that there is ample expert testimony that SCM's discharges have harmed some portions of the population and further contends that even if the court concludes that there is only a risk of injury to portions of the population, this Court should order the first phase of the survey. The Court does not agree.

It may be true that ground level concentrations of sulfuric acid mist equal to those predicted by Dr. Swift would constitute a significant hazard to the public health. Nevertheless, the Court is not persuaded that the concentrations predicted by Dr. Swift accurately represent concentrations likely to have occurred, likely to be occurring or likely to occur in the future in the area surrounding SCM's Hawkins Point Plant. The predicted concentrations are based on unreliable data and assumptions.

The concentrations predicted by Drs. Egan and Mills are better founded. Drs. Egan and Mills utilized actual data and a range of emission test results. Based on the Egan and Mills concentrations, and using a "worst case" scenario, Dr. Utell opined that SCM's emissions constituted a health hazard to one subgroup of the population, exercising, adolescent asthmatics. The Court is convinced that concentrations of a level likely to present a hazard to that subgroup occur at such infrequent intervals and with such limited duration as to constitute no significant hazard. Moreover, recent stack tests show SCM's emissions to be in compliance with relevant SIP limits for sulfuric acid mist. Therefore, the slight risk of adverse health effects presented by emission levels equal to the 1983 Weston results is currently almost non-existent.

The evidence in the record simply does not support an Order by this Court that an environmental survey be conducted. Nor will the Court award costs of litigation, attorneys fees or expert witness fees to MWC. Such an award would not be appropriate in this action. 42 U.S.C. § 7604(d).

A final judgment incorporating the decision herein will be entered contemporaneously with the filing of this Opinion.

### JUDGMENT ORDER

In accordance with the Opinion dated September 1, 1987, and filed in the above-entitled case, it is

ORDERED and ADJUDGED:

That judgment is hereby entered for the plaintiff United States of America and against the defendant SCM Corporation on the original claim in the amount of $350,-000.00 in civil penalties; and,

That judgment is hereby entered for the defendant SCM Corporation and against the intervening plaintiff Maryland Waste Coalition on the intervening claim.