UNITED STATES of America, Plaintiff,

v.

TZAVAH URBAN RENEWAL CORP., et al., Defendants.

Civ. A. No. 88–3647.

United States District Court, D. New Jersey.

Oct. 11, 1988.

Kevin McKenna, Asst. U.S. Atty., Newark, N.J., for the Government.

Jane M. Hanson and Diana Bordonaro, Porzio, Bromberg & Newman, Morristown, N.J., for defendants.

## OPINION AND ORDER

LECHNER, District Judge.

The Government has made an application on behalf of the Environmental Protection Agency ("EPA") for a preliminary injunction to abate a serious health hazard posed by dry asbestos, a known carcinogen and the cause of a debilitating lung disease, asbestosis. Defendants Tzavah Urban Renewal Corporation ("Tzavah"), Pinros/Gar Datsun Investments ("Pinros"), Henry Roth ("Roth"), Sol Mayer ("Mayer") and Harry Hampel ("Hampel") (collectively, "defendants") own and/or operate a building located at 16 Park Place, Newark, New Jersey, formerly known as the Old Military Park Hotel. Defendants purchased the hotel from the city of Newark in August of 1986 and commenced renovation the following year. On October 16, 1987, defendants were contacted by the EPA and advised that the building was contaminated with asbestos and that the renovation work was being conducted in violation of the Clean Air Act and federal work practice standards for asbestos.

Over the past year, the EPA has repeatedly ordered defendants to comply with these regulations. The Government alleges that the defendants' response has been inadequate and now requests that the court enjoin defendants to secure the facility, to properly collect and dispose of the friable asbestos containing material present on site, and to comply with the requirements of federal law and the administrative compliance orders previously issued to defendants. Although defendants have accelerated efforts to meet EPA's concerns in recent weeks, their failure to comply fully and do so in a timely fashion warrants the exercise of the court's equity powers. For the reasons discussed below,

the Government's motion for a preliminary injunction is granted.

*Facts*

The history of this case exemplifies the difficulties often encountered in the enforcement of environmental regulation. Defendants Mayer t/a Pinros and Roth purchased the Old Military Park Hotel, located at 16 Park Place, Newark, New Jersey, from the city of Newark for $250,000 in August of 1986. Hampel Affidavit, ¶ 3. Although Mayer and Roth were given an opportunity to inspect the facility before bidding, the city did not inform prospective buyers that the hotel was permeated with asbestos containing materials ("ACM").[1] Hampel Affidavit, ¶ 47. When defendants bought the building, it was in great disrepair and had been uninhabited for many years. The proposed renovation of the hotel was considered to be an urban renewal project. In order to qualify for the tax abatement offered such projects, the owners created Tzavah, an urban renewal corporation.[2] Hampel Affidavit, ¶ 7.

In June of 1987, defendants engaged Creer Industrial Corporation to "gut" the hotel at a cost of $300,000. While this work was going on, Jose Rodriguez ("Rodriguez"), an EPA inspector, conducted an investigation of the site and concluded that the hotel was contaminated with asbestos. Rodriguez observed Creer employees throwing asbestos laced objects out of the windows of the building and noted an uncovered refuse pile next to the hotel which also contained ACM.

The workers were not wetting the debris before heaving it out of the windows; the refuse pile was also dry.[3] As a result, asbestos dust was being released into the air. Rodriguez Affidavit, ¶ 6. Though the hotel is located in a commercial district, there are private homes situated nearby. Fitzpatrick Affidavit, ¶ 5, Exhibit 3. An active garage stands to the right of the building, a government office to the left, and a municipal park across the street. The only fence surrounding the facility was broken and hence passers-by could easily gain access to the contaminated hotel. Concerned with the danger to public health posed by the asbestos, Rodriguez immediately pursued his investigation.

Rodriguez tested five samples taken from the facility and found they all contained friable asbestos.[4] Renovation of buildings contaminated with asbestos is regulated by Section 112 of the Clean Air Act (the "Act"), 42 U.S.C. § 7412 and the National Emission Standard for Hazardous Air Pollutants ("NESHAP"), 40 C.F.R. Part 61, Subpart M. These regulations require owners and/or operators of facilities containing ACM to notify the EPA before commencing with renovation and/or demolition, 40 C.F.R. § 61.146, and prescribe various procedures for storage and removal of the asbestos. Tzavah failed to provide this notice. Rodriguez determined that the hotel contained approximately 9500 linear feet and 2500 square feet of ACM in the building. Rodriguez Affidavit, ¶ 6b.

Apparently, defendants did not learn of Rodriguez' visit until October 16. Hampel Affidavit, ¶ 13. Defendants subsequently ordered Creer to stop work at the hotel and hired the Environmental Monitoring and Consulting Associates ("EMCA"), a testing laboratory, to conduct an independent analysis of the premises. Hampel Affidavit, ¶ 18. There is some confusion regarding the timing and substance of Rodriguez' ensuing communications with the defendants. (Compare Rodriguez Second Affidavit, ¶¶ 3–5 and Hampel Affidavit, ¶¶ 16–18.) According to Rodriguez, he spoke with de-

---

1. Based on the submissions of both parties, it is not clear whether or not the City of Newark was aware that asbestos was present in the Old Military Park Hotel.

2. Though defendants intended that Tzavah purchase the property from the owners, transfer of title has not occurred. Tzavah acts as an agent for the owners. Hampel Affidavit, ¶ 6.

3. Under the NESHAP regulations, friable asbestos materials removed from a facility must be adequately wetted whenever exposed in order to prevent the emission of asbestos into the environment. 40 C.F.R. § 61.147.

4. "Friable asbestos material means any material containing more than 1 percent by weight that hand pressure can crumble, pulverize, or reduce to powder when dry." 40 C.F.R. § 61.141.

fendant Hampel on October 16, 1987 and told him that there were probably numerous, serious asbestos violations at the hotel and that Tzavah must comply with the EPA asbestos regulations at 40 C.F.R. Part 61, Subpart M. Rodriguez states: "It was my understanding that [Hampel] would read the asbestos regulations and comply with them fully." Rodriguez Second Affidavit, ¶ 6.

Hampel recalls that this conversation took place on October 29 and that Rodriguez merely informed him that any additional removal would have to be carried out by an approved asbestos removal contractor. Hampel Affidavit, ¶ 17. That day, Hampel wrote Rodriguez, advising him that all work at 16 Park Place had ceased, EMCA had been retained, efforts were being made to retain an engineer knowledgeable in asbestos removal and a certified contractor would be hired to remove the asbestos and ACM upon receipt of the test results. Hampel Affidavit, ¶ 18, Exhibit D. Defendants received their test results confirming the presence of asbestos in the hotel on November 9, 1987. Hampel Affidavit, ¶ 19, Exhibit E. However, no efforts were made toward removing the asbestos until July of 1988.

On December 9, 1987, EPA issued Tzavah Compliance Order Index No. 70234, mandating compliance with 40 C.F.R. Part 61, Subpart M during all renovations and/or demolitions in which friable asbestos is present. Rodriguez Affidavit, ¶ 8, Exhibit 4. In letters, dated December 23, 1987 and January 28, 1988, Tzavah assured EPA that it was proceeding to remedy the violations and to comply with the asbestos NESHAP regulations and EPA's order. Rodriguez Affidavit, ¶ 10, Exhibits 9–11. Tzavah wrote a follow-up letter to Christopher Daggett, EPA Regional II Administrator, on January 28, enclosing a copy of

the "Specifications for Asbestos Insulation Removal at 16 Park Place, Newark, New Jersey" which had been prepared by EMCA.[5] From February until July of 1988 defendants were engaged in the process of hiring an asbestos removal contractor. In June, Asbestos Control Consultants was retained to provide consulting services for the asbestos removal project and Mariscott–Douglas, an asbestos abatement contractor, was hired in July. Hampel Affidavit, ¶¶ 22, 26–33, Exhibit H. Despite these communications with EPA and his efforts to find an experienced asbestos contractor, Hampel asserts that he believed the compliance order had been satisfied at the time it was received, as all operations at the property had ceased in October. Hampel Affidavit, ¶ 20.

Rodriguez made two follow up visits to the facility on June 21 and July 11. He found the hotel to be in essentially the same condition as in October. There were still large amounts of visible ACM in the building. In addition to the debris pile Rodriguez observed earlier, there was another waste pile. Both piles were dry and uncovered. Rodriguez Affidavit, ¶¶ 11–12. As on his first inspection, the windows in the building did not have panes and were unsealed. Access to the building was not secured. Rodriguez and his associate, EPA investigator Robert Fitzpatrick ("Fitzpatrick"), took five samples from the area. All contained friable asbestos. Rodriguez Affidavit, ¶ 12, Exhibit 14.

On July 13, EPA met informally with Tzavah and Edward Hogan ("Hogan"), counsel for the owners. There are also discrepancies as to what was said at this meeting. According to Faith Halter ("Halter"), Chief of the Air and Pesticides Branch, EPA made clear its "extreme concern" about the continuing violations at 16

---

**5.** There is much dispute between the parties regarding this report. Defendants allege that their submission was intended to be the asbestos removal plan required by § 114 of the Act and the EPA's failure to respond constituted a lack of interest on EPA's part in enforcing applicable law. Defendants' Brief, p. 29. Faith Halter, Chief of the Air and Pesticides Branch of EPA, asserts that the January report was submitted as general information in response to the reporting requirement of A.O. 70234 and was not responsive to the compliance requirements of NESHAP. Halter Affidavit, ¶¶ 13–14. Rodriguez confirms that the January "plan" was irrelevant for the purposes of EPA approving a valid asbestos removal plan. Rodriguez Second Affidavit, ¶ 18.

Park Place and informed defendants that EPA would be issuing additional compliance orders. Halter Affidavit, ¶ 7. Hampel acknowledges that EPA expressed concern that the building and the property be secured. Hampel Affidavit, ¶ 30. However, it was Hampel's understanding that "secured meant installing plastic from floors one through three and securing a fence around the property." *Id.* at ¶¶ 30 and 51. Halter does not recall any statement by an EPA representative to this effect. "Such a statement would have been contrary to the requirements of the law and our normal practice." Halter Affidavit, ¶ 7.

Two weeks later, defendants received warning that EPA intended to issue another administrative order requiring Tzavah to secure the property at 16 Park Place within 48 hours. Hogan Affidavit, ¶ 3. EPA issued Compliance Orders 80120, 80121 and 80122 to defendants Tzavah, Pinros and Roth on July 28.[6] Defendants received EPA's new orders on August 1; their terms should have been complied with by August 3.

Site visits by EPA inspectors showed that as of August 5, defendants had only partially sealed four windows out of the approximately four hundred thirty five in the building, and had neither covered nor wetted the debris piles. Halter Affidavit, ¶ 10. Although Rodriguez asserts that it was possible to seal all of the windows in the building within forty eight hours, he notes that defendants actually had over two and one-half weeks (from the July 13 meeting until August 3) to complete the task. This was ample time. Rodriguez Second Affidavit, ¶ 21. Hampel counters that compliance on such short notice was impossible. Mariscott–Douglas was not scheduled to begin work on the facility until August 8, 1988. Hampel Affidavit, ¶ 36; Nowicki Affidavit, ¶¶ 10–16.

Defendants did make some effort to comply with the substance of the order. Mariscott–Douglas provided nineteen workers for the week of August 12. Defendants retained Consec Security Group to patrol the property and installed two fences. But, as the testimony of Neal Amsel, project monitor for the asbestos clean up, illustrates, defendants encountered numer-

---

**6.** These three orders are identical and, in part, require defendants to:

> III. Within 48 hours of its receipt of this order, Respondent shall take all necessary steps to secure the facility so that members of the public will not be exposed to asbestos containing material and such material will not be released into the environment. Such steps shall include (but not necessarily be limited to): sealing off all windows and other apertures from the building to the ambient air; adequately wetting and securing, or properly disposing of the waste piles behind the building and any other asbestos containing material outside the building; securing access to the building; and securing access to the property on which the building is located. Within 5 days of receipt of this order, Respondent shall submit to EPA a report describing, in detail, the measures it has taken to comply with this paragraph.
>
> IV. Within ten days of receipt of this order, Respondent shall submit to EPA a written plan for collection and disposal of all exposed friable asbestos containing material (ACM) currently at the facility. [Detailed requirements of the plan omitted.]
>
> V. Except to the extent that it is necessary to comply with Paragraphs III and IV above, Respondent shall not enter the site or allow any person other than authorized government officials and/or agents to enter the site, until authorized to do so by EPA. Respondent shall not perform any wrecking or dismantling which would break up or preclude access to friable asbestos materials unless authorized to do so by EPA.
>
> VI. Upon receiving approval from EPA, Respondent shall carry out its plan submitted pursuant to paragraph IV above for collecting and disposing of exposed ACM at the facility. Respondent shall notify EPA orally within 24 hours of any changes in its schedule. Respondent shall notify EPA orally within 24 hours and in writing within 5 days of the complete execution of the plan.
>
> VII. Within twenty days of receipt of this order, Respondent shall submit to EPA a report describing its plans for additional renovation and/or demolition at the facility and how it plans to comply with the asbestos NESHAP during such activities. [Details of reporting requirements omitted.]
>
> VIII. Respondent shall not perform any further renovation and/or demolition at the facility until authorized to do so by EPA. Upon receiving approval from EPA, Respondent may proceed with renovation and/or demolition in accordance with EPA's approval of its plan submitted pursuant to paragraph VII above. [Details of notification requirements omitted.] [Rodriguez, exhibits 15–17.]

ous difficulties during this period. On August 4, materials brought to the facility were stolen; Mariscott–Douglas continually misrepresented the number of workers that would be assigned to the site; and Amsel had difficulty securing the parts needed to reactivate water pumps which had been in disrepair for years. Nowicki Affidavit, ¶¶ 13–17; Amsel Affidavit, ¶¶ 5–8. During Rodriguez' August 5 inspection, he observed the following: four windows on the ground floor were partially sealed; no other windows were sealed; there was no water for wetting ACM on site; the waste piles were uncovered and the material was dry; the fence on the right side of the building remained down [7] and the fences erected by Tzavah were of no value, because they did not enclose the entire perimeter of the property and thus did not prevent public access to the site. Rodriguez Affidavit, ¶ 18; Rodriguez Second Affidavit, ¶ 20.

On August 8, EPA received a report from defendants that purported to satisfy the requirements under the compliance orders that they submit a five day report and clean up plan. The next day EPA notified defendants that both reports contained major deficiencies including failure to wet the waste piles, lack of specific detail and an inadequate schedule for sealing the hotel windows. Rodriguez Affidavit, ¶ 21. Rodriguez and Fitpatrick returned to the facility on August 10. When they arrived at 11:50 a.m., no workers were on site, there was no water for wetting the ACM, only about thirty windows had been sealed and there was evidence that vagrants had been inhabiting the asbestos ridden hotel. Rodriguez Affidavit, ¶ 19. Subsequent inspections were conducted August 16 and 17. Defendants had still failed to satisfactorily comply with EPA's orders. The Government filed this motion for the issuance of a preliminary injunction on August 19, 1988.

Due to the recent Jewish holidays, over three weeks elapsed between the Government's filing and defendants' response. During this period, defendants have made additional progress toward securing 16 Park Place and complying with the asbestos NESHAP regulations. By August 30, each window had been sealed, nylon reinforced plastic was placed on the rear debris piles and the reducing valve necessary to draw water directly from the building was installed. Nowicki Affidavit, ¶ 17. On September 7, Rodriguez once again visited the facility. He found significant amounts of dry, stripped ACM still in the building and noted that access to the site remains insecure. Rodriguez Second Affidavit, ¶ 20.

*Discussion*

As the above facts reveal, the EPA has attempted to remedy the hazardous condition at 16 Park Place for almost a year. Thus far, the Agency's efforts to assure defendants' full compliance with the NESHAP regulations have proved ineffectual. Asbestos is still present at the facility and continues to pose a significant danger to the health of the community. In order to ensure that this danger is abated, the Government brought this action for injunctive relief pursuant to Section 113 of the Clean Air Act (the "Act"), 42 U.S.C. § 7413.

I.  Plaintiff's Motion Is Not Moot

■ Defendants allege that they are presently in compliance with the statutes, regulations and orders at issue and assert that the injunctive relief sought by the Government is moot. It does appear the conditions at the Park Place facility have improved. Nevertheless, the Government disputes defendants' assertion that the hazard to public health has been cured. As recently as September 7, EPA engineer Rodriguez inspected the facility and observed that defendants continue to violate the wetting requirement of 40 C.F.R. § 61.147(e)(1). Rodriguez explains, "... I found significant amounts of dry, stripped ACM which was on or hanging from vertical pipes which run from the top to the

---

7.  Defendants assert that they do not own this fence and hence were not responsible for its

repair.  Hampel Affidavit, ¶ 39.

bottom of the building. The ACM on these pipes is friable, exposed to air currents in the building and should be wetted." Rodriguez Second Affidavit, ¶ 19.[8] Rodriguez also noted that although defendants have erected fences on the property, "they do not completely encircle the property and do not prevent access to the site." *Id.,* ¶ 20.

It is established that the voluntary cessation of allegedly illegal conduct "does not deprive the tribunal of power to hear and determine the case, i.e. does not make the case moot." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The defendants' long history of non-compliance and Rodriguez' recent findings reveal a risk of continued and recurring violations. Even if defendants have made recent good faith efforts at compliance as they allege, to say that the case has become moot implies "that the defendant is entitled to dismissal as a matter of right." *Id.* This is certainly not the case when, as here, defendants accelerate efforts at compliance in the intervening period between the filing of the Government's motion and submission of defendants' reply. The Supreme Court has warned: "[I]t is the duty of the courts to be aware of efforts to defeat injunctive relief by protestations of repentance therefrom, especially when abandonment seems timed to anticipate suit, and there is a probability of resumptions." *United States v. Oregon State Medical Society,* 343 U.S. 326, 330, 72 S.Ct. 690, 694, 96 L.Ed. 978 (1952).

█ Defendants also assert that an injunction is unnecessary because there is "no current renovation operation being conducted at 16 Park Place." Defendants'

Brief, p. 16. This argument is based on a fundamental misinterpretation of the asbestos NESHAP. As the Government correctly points out, the NESHAP regulations are activated when demolition or renovation begins and remain in effect until the facility has been rid of the dangers posed by asbestos dust. To permit a building owner to commence renovation and when asbestos is discovered, simply discontinue work with impunity, defies the purpose and logic of the statute.[9] The procedures for asbestos emissions control and the waste disposal provisions of the regulations, 40 C.F.R. §§ 61.147 and 61.152, anticipate that once asbestos is identified, it will be rendered non-hazardous by proper disposal. Defendants cannot circumvent the affirmative obligation imposed upon them by federal law and simply walk away from the Park Place project. Indeed, the defendants' numerous efforts at compliance underscore their awareness of this responsibility.

█ In another attempt to escape their obligations under the Clean Air Act, defendants contend that § 61.152 of the NESHAP regulations does not apply to them. Section 61.152 requires owners of a facility to deposit all ACM at waste disposal sites and to prevent the discharge of visible emissions to the outside air during collection. Arguing that this section contemplates only the *final* disposal site for waste material, defendants assert "[i]t is disingenuous of the government to argue that piles of debris in the rear yard of the site are final waste disposal sites." Defendants' Brief, p. 18. Once again, defendants misconstrue the regulations. Section 61.152 makes no reference to "final" disposal sites. Further, if this provision ap-

---

**8.** In a letter submitted to the court on September 21, 1988, one day before oral argument on EPA's motion was to be heard, defendants contend that the assertions in paragraph 19 of Rodriguez' supplemental affidavit raise new facts regarding defendants' noncompliance. The letter reads: "A review of Mr. Rodriguez's original affidavit and the motion papers submitted by the plaintiff shows that the government initially did not raise asbestos hanging from risers as an issue in this case." In view of the general language of EPA's compliance orders and the NESHAP regulations, defendants' argument is

without basis. Rodriguez was responsible for detecting the presence of ACM throughout the hotel. His September 7 finding of asbestos on the vertical pipes does not raise a new factual issue.

**9.** 42 U.S.C. § 7401(b)(1) reads:

The purpose(s) of this subchapter are to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.

plied only to the final deposit of asbestos containing material, the risk to human health posed by any interim collection of ACM would remain unabated. This would defeat the regulatory objective by allowing for the continued emission of asbestos dust while debris is being transferred to its final resting place.

## II. The Standard for Issuance of a Preliminary Injunction

A plaintiff seeking a preliminary injunction must prove (1) a reasonable probability of success on the merits, (2) the likelihood of irreparable injury if the offensive conduct is not enjoined, (3) that granting preliminary relief will be in the public interest; and (4) a balancing of hardships favors the moving party. *ERCI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 852 (3rd Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).

On August 11, 1988, another judge from the District of New Jersey applied this standard in a similar case involving violations of the asbestos NESHAP and granted the government's motion for a preliminary injunction against the owners and operators of a demolition operation. *United States v. Anthony Dell'Aquila Enterprises*, —— F.Supp. ——, Civil Action No. 88–3232 JWB (D.N.J. Aug. 11, 1988). In another case involving violations of asbestos NESHAP, a judge in the District of Connecticut granted the United States' motion for a temporary restraining order against an owner and an operator of a demolition operation. *United States v. Big Apple Wrecking Company, Inc., et al.*, Civil Action No. N–86–218 EBD (D.Conn. June 30, 1986). Injunctive relief is especially appropriate in this case, as defendants have been given ample opportunity to rectify their violations of federal law before this court was asked to intervene.

## A. *Reasonable Probability of Success on the Merits*

Section 113 of the Act gives the Administrator of EPA authority to seek injunctive relief and/or the assessment of civil penalties whenever he finds that an owner or operator of a facility violates or fails or refuses to comply with any NESHAP regulation or any order issued pursuant to 42 U.S.C. § 7413(a). Defendants' violations of the asbestos NESHAP requirements and failure to comply with EPA orders have been well documented. It is very likely that the Government will succeed in imposing penalties upon defendants.

Defendants counter this claim with two arguments. First, because defendants' violations were not "knowing or intentional" the Government is not entitled to relief under the statute. Answer, ¶¶ 7, 8, 9. In the alternative, defendants claim that the Government has not substantiated its allegations regarding their alleged violations.

### 1. No Mens Rea is Required under the Clean Air Act and NESHAP Regulations

Defendants' first contention is not supported by the Clean Air Act's underlying objectives. The District Court for the Eastern District of California has held that the Act and asbestos NESHAP "provide strict liability for civil violations of their provisions." *U.S. v. Ben's Truck and Equipment, Inc.*, 25 E.R.C. 1295, 1298 (E.D.Cal.1986) [available on WESTLAW, 1986 WL 15402]. I agree with the California court's finding that strict liability is "essential to meet the purpose of the Act and to protect and improve the quality of the nation's air." *Id.* Furthermore, the statute and regulations themselves do not indicate that scienter is required for establishing violations of the Act.

By way of analogy, it is noted that certain federal criminal statutes which are essentially regulatory in nature and are designed to protect the public welfare "as a matter of policy, do not specify intent as a necessary element." *Morissette v. United States*, 342 U.S. 246, 252, 72 S.Ct. 240, 244, 96 L.Ed. 288 (1952); *United States v. Engler*, 806 F.2d 425, 431 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1900, 95 L.Ed.2d 506, (1987) (strict liability imposed on individuals who hunt migratory birds in

violation of the Migrating Bird Treaty Act). Although the Clean Air Act is a civil not criminal statute, the penalties imposed for the improper disposal of asbestos can be considered quasi-criminal and the purpose of the statute is regulatory.

Imposing a strict liability standard for violations of the asbestos NESHAP is also supported by well accepted principles of tort law. Under the rule of *Rylands v. Fletcher*, L.R. 1 Ex. 265 (1866), *aff'd*, L.R. 3 H.L. 330 (1868), a landowner is strictly liable for any damages caused by ultrahazardous activities conducted on his land. This principal has recently been acknowledged by the New Jersey Supreme Court in *State Dept. of Environ. Protec. v. Ventron Corp.*, 94 N.J. 473, 488, 468 A.2d 150 (1983) (a landowner is strictly liable to others for harm caused by toxic wastes that are stored in his property and flow onto the property of others). Section 519 of the Restatement of Torts 2d reads:

§ 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

The NESHAP regulations clearly bring the emission of asbestos within this concept of "ultrahazardous activity." [10] Asbestos is regarded as extremely dangerous to human health, threatening individuals who reside in the vicinity of an asbestos source like the Old Military Park Hotel. *See infra* p. 1022. While the NESHAP regulations do not hold defendants liable to individuals harmed by the ACM found in the hotel, they are concerned with preventing the possibility of this harm. The imposition of strict liability for the defendants' conduct is both appropriate and well supported.

2. Defendants' Violations are Well Documented

In order to counter the defendants' second argument and establish defendants' liability under the Act, the Government must establish only that the minimum threshold requirements of the asbestos NESHAP have been met: (1) that defendants are owners or operators of a stationary source; (2) that asbestos containing material was present in the facility being renovated, and (3) that specific requirements of the regulations have been violated. *Ben's Truck*, 25 E.R.C. at 1295.

Any person who "owns, leases, operates, controls or supervises a stationary source" is liable as an owner or operator under 40 C.F.R. § 61.02. Defendants Mayer, Pinros and Roth admit that each is an owner of the 16 Park Place facility. Answer, ¶¶ 1, 7, 8, 9. Although defendants Tzavah and Hampel assert they are merely "agents" of the owners, "owner or operator" is defined broadly for purposes of asbestos regulations as "any person who owns, leases, operates, controls, or supervises a stationary source." 40 C.F.R. § 61.02; *United States v. Geppert Bros, Inc.*, 638 F.Supp. 996, 999 (E.D.Pa.1986). The activities of Tzavah and Hampel, including the hiring and firing of contractors, reveal that they were actively engaged in the supervision of the Park Place project and hence are "owners or operators" within the meaning of the Act.

---

**10.** See also, Restatement (Second) of Torts § 520:

§ 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land, or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

The Government's evidence of asbestos NESHAP violations at the facility has been well substantiated. Defendants even admit that the amount of friable asbestos materials at 16 Park Place exceeded the 260 linear feet or 160 square feet minimum set by the regulations. Answer, ¶ 15. They also acknowledge their failure to provide EPA with written notification of their intention to renovate as required by 40 C.F.R. § 61.146 and their failure to wet the friable asbestos materials stripped from the facility. Answer, ¶ 17; Defendants' Brief, p. 17. Thus, the Government has established a reasonable probability of success on the merits.

**B.** *The Likelihood of Irreparable Injury and the Public Interest*

As injury to the environment is especially difficult to remedy, injunctive relief is appropriate when a defendant's conduct poses a continued threat to environmental well being. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987); *see also PIRG of New Jersey v. Top Notch Metal Finishing Co.*, 26 E.R.C. 2012, 2015 (D.N.J.1987) [available on WESTLAW, 1987 WL 44393] (violations of pretreatment requirements of Clean Water Act by metal finishing company poses irreparable injury to environment). The presence of ACM within the hotel and the continued emission of asbestos dust into the surrounding community pose a significant health risk to the squatters who intermittently inhabit the hotel as well as the residents and workers who are present in the area.

The toxicity of asbestos was described in the preamble to the original asbestos NESHAP:

Asbestos is a hazardous air pollutant within the meaning of Section 112. Many persons exposed to asbestos dust developed asbestosis when the dust concentration was high or the duration of exposure was long. A large number of studies have shown that there is an association between occupational exposure to asbestos and a higher-than-expected incidence of bronchial cancer. Asbestos also has been identified as a causal factor in the development of mesotheliomas cancers of the membranes lining the chest and abdomen. There are reports of mesothelioma associated with nonoccupational exposures in the neighborhood of asbestos sources. An outstanding feature has been the long period, commonly over 30 years, between the first exposure to asbestos and the appearance of a tumor. There is evidence which indicates mesotheliomas occur after much less exposure to asbestos dust than the exposure associated with asbestos.

38 *Fed.Reg.* 8820 (April 6, 1973) (citations omitted). As the Government notes in its brief, the danger of asbestos has also been judicially noted in *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 508–509 n. 26, modified, 529 F.2d 181 (8th Cir.1975).

... a study of 76 cases of mesothelioma drawn from the files of a London hospital showed that, of 45 victims who had not worked with asbestos, nine had simply lived in the household of an asbestos worker, 11 had lived within one-half mile of an asbestos plant. Finally a study of 42 mesothelioma victims drawn from the files of the Pennsylvania Department of Health revealed that, of 22 victims who had not been occupationally exposed, three had lived in the household of an asbestos worker and eight had lived within one-half mile of an asbestos plant.

As defendants point out, injunctive relief should not be issued as a matter of course. Rather, an injunction should only issue "when the intervention of a court of equity 'is essential in order effectively to protect property rights against injuries otherwise irremediable.'" *Weinberg v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (citing *Cavanaugh v. Looney*, 248 U.S. 453, 39 S.Ct. 142, 63 L.Ed. 354 (1919)). However, in this case the Government has met its burden of establishing a threat to public health which may very well prove irremediable. *Getty*

*Oil Co. v. Ruckelshaus,* 467 F.2d 349, 357 (3d Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973) (In an enforcement proceeding under the Clean Air Act, "the burden of establishing a violation of the applicable regulation would be carried by the government.").[11]

In view of defendants' long standing failure to comply with EPA's orders, there is certainly more than a "mere possibility" that future violations of the asbestos regulations will occur. *W.T. Grant,* 73 S.Ct. at 898; *United States v. SCM Corp.,* 667 F.Supp. 1110, 1128 (D.Md.1987). Contrary to the defendants' assertions, the Government has made a clear showing of irreparable harm and the imposition of civil penalties would in no way compensate victims exposed to asbestos as a result of the defendants' disregard for EPA's orders. The extreme danger of such exposure also underscores that it is in the public interest to enjoin the defendants' unlawful conduct.

### C. Balancing of Hardships

■ This prong of the test for injunctive relief is easily met: the danger of asbestos has been established, while no potential for hardship to the defendants has been suggested. In fact, defendants contend that they have made good faith efforts at compliance and have continually asserted that they intend to comply with the asbestos NESHAP. Defendants' Brief, p. 29; Hampel Affidavit, ¶¶ 18, 54. If this is the case, the relief requested will not harm them at all, it will only comport with their professed intentions. A preliminary injunction mandating defendants' compliance, then, poses no cognizable risk of hardship to defendants.

### III. Validity of EPA's Compliance Orders

■ In a *final attempt to avoid the imposition of a preliminary injunction,* defendants argue that the compliance orders issued by EPA are invalid. They contend that the December order did not specify a time for compliance and the August 1 orders neither specified a reasonable time frame nor took into account defendants' good faith efforts to comply with applicable requirements. Disputing these claims, the Government points out that the December 1987 order was effective immediately upon receipt. Compliance Order, No. 70234, p. 8. Further, as alluded to in the earlier discussion of the facts, although the August orders gave defendants only forty eight hours to comply, they actually received almost three weeks notice (not including the effective notice of violations provided by the first order in December). As for defendants' good faith efforts, while in recent weeks progress towards compliance has been made, for almost seven months after independently confirming the presence of asbestos in the hotel, defendants took minimal action to abate this environmental hazard.

### Conclusion

Defendants are "owners and/or operators" within the meaning of the Clean Air Act. From the time they purchased the Old Military Park Hotel in 1986, they have committed numerous violations of the Act

---

**11.** In their September 21, 1988 letter, defendants request the court to consider reports by the Courdish–Roberts Group and Mariscott–Douglass submitted on behalf of defendants. These reports provide an analysis of air samples taken on August 30 and 31 and indicate that the concentration of asbestos inside the hotel is below the "exposure limit" proscribed by the Occupational Safety and Health Administration ("OSHA") regulations at 29 C.F.R. § 1910.1001(b)(c). Based on these reports, defendants extrapolate that the concentration of asbestos outside the building would be even lower. Defendants conclude, "[b]ecause the level of asbestos in the atmosphere is *de minimus,* it is respectfully submitted, plaintiff has failed to demonstrate the irreparable harm necessary to support its application for a preliminary injunction."

Not only was this submission of fact filed eleven months after defendants were first put on notice that asbestos was present within the hotel, defendants also fail to substantiate the relevance of the OSHA regulations to this action. EPA has determined that defendants are in violation of regulations which specifically address renovation of an asbestos-infested building. Defendants' belated argument attempts to undercut EPA's year long investigation but instead provides further indication that they have refused to acknowledge the severity of the charges brought against them.

**1024**

and the asbestos NESHAP regulations. Defendants have also failed to comply with the compliance orders issued to them by EPA. The Government has established a reasonable probability of success on the merits, the likelihood of irreparable injury if the asbestos in the hotel is not properly disposed of, and that a balancing of hardships favors granting an injunction. Because it is so clearly in the public interest to grant a preliminary injunction enjoining defendants to secure the facility, properly dispose of the ACM, and comply with EPA's orders, the Government's motion is granted.